345 So.2d 480 (1977)
LOUISIANA NATIONAL LEASING CORPORATION
v.
FAMILY POOLS, INC., et al.
No. 58834.
Supreme Court of Louisiana.
April 11, 1977.
Rehearing Denied May 13, 1977.
Philippi P. St. Pee, Francipane, Regan & St. Pee, Metairie, for defendants-applicants.
Charles S. McCowan, Jr., John Dale Powers, Sanders, Downing, Kean & Cazedessus, Baton Rouge, for plaintiff-respondent.
*481 DENNIS, Justice.
This case arises out of Louisiana National Leasing Corporation's (National Leasing's) efforts to recover, under five separate contracts denominated as leases, delinquent payments and future payments for the full term of each contract. Named as defendants in solido were Family Pools, Inc., designated the lessee of certain movable construction equipment, and three gratuitous sureties, J. Stanley Middleton, Jr., Sherard Fabacher, and Peter Fabacher, who had guaranteed the lessee's performance of its obligations under each contract.
Family Pools' default on each of the leases was stipulated. After trial, the district judge ruled that the leases had been terminated following the lessee's default, but that National Leasing failed to comply with the final accounting provisions of the leases, which required it, upon termination, to obtain the leased equipment, have it sold, and apply the proceeds against the balance due by the lessee. The effect of this failure was, according to the district judge, to prejudice the subrogation rights of the sureties, because the equipment, which remained in the hands of the lessee continued to depreciate, so that the court, at the time of trial, found it
"* * * difficult, if not impossible to determine the extent of the sureties' liabilities at the time of the default of the lessee,"
several months earlier. On the authority of Louisiana Civil Code Article 3061[1] the district court ruled that the Fabachers were discharged from their suretyship obligations, and rendered judgment accordingly, dismissing National Leasing's suit against them. However, the district judge found National Leasing entitled to recover from defendant-lessee on four of the five contracts,[2] and so rendered judgment in favor of National Leasing and against Family Pools, Inc., and J. Stanley Middleton, Jr., in the amount of $62,199.44[3] together with legal interest and attorney's fees.
National Leasing devolutively appealed, arguing that the district court erroneously dismissed its suit on one of the five contracts, and further urging that the court improperly dismissed its claims against the Fabachers as solidary sureties on all five of the contracts. The Fourth Circuit Court of Appeal reversed, finding that "* * * none of the `leases' * * * [had] been terminated in such manner as to extinguish the `lessee's' liability for `rent,'" and that the Fabachers' "general defensive contentions" were without merit. 338 So.2d 1156 (La.App. 4th Cir. 1976). Accordingly, the court of appeal rendered judgment in favor of Louisiana National Leasing Corporation and against Family Pools, Inc., J. Stanley Middleton, Jr., Sherard Fabacher and Peter Fabacher, in solido, in the amount of $72,020.80,[4] together with legal interest plus attorney's fees, and subject to credit for all sums paid by any of the defendants since suit was filed.
Additionally, the court of appeal recognized the Fabachers' third-party claims *482 against Family Pools, Inc., and J. Stanley Middleton, Jr., and in its decree rendered judgment in favor of Sherard and Peter Fabacher against Family Pools, Inc., and J. Stanley Middleton, Jr., in solido, for "such amounts as they may ultimately be obliged to pay, as sureties, to Louisiana National Leasing Corporation" under the judgment rendered in its favor.
On application of the solidary sureties, Sherard and Peter Fabacher, we granted writs to review the correctness of the ruling of the court of appeal. For the reasons hereinafter assigned, we affirm the judgment of the court of appeal.
The issues presented by this appeal must be resolved principally by reference to the contracts which form the law between the parties. La.C.C. art. 1901; Oil Field Supply & Scrap Material Co. v. Gifford Hill & Co., 204 La. 929, 16 So.2d 483 (1944); Brignac v. Boisdore, 272 So.2d 463 (La.App. 4th Cir. 1973), affirmed, 288 So.2d 31 (La. 1973).

Ten Day Termination Letter
Each of the five contracts sued upon by National Leasing contained the following, or almost identical, language:
"DEFAULT. (a) The following acts shall each constitute a default: (1) Lessee's failure to pay any installment of rental when due * * *. Upon such default, Lessor may, at Lessor's option, by written notice to Lessee, terminate this lease." (Emphasis supplied.)[5]
Default by Family Pools, Inc., the lessee, on payment of the monthly sums due under the contract was stipulated by the parties. In the closing months of 1972, considerable correspondence was exchanged, and a number of discussions were held between the parties regarding Family Pools' default. Then, on January 5, 1973, a letter bearing the notation, "TEN DAY TERMINATION NOTICE," was sent by National Leasing's accounts manager to its attorney.[6] Copies of this letter were mailed to J. Stanley Middleton, Jr., Sherard Fabacher and Peter Fabacher. However, a copy of the letter was never mailed to the lessee, Family Pools, Inc. Moreover, the evidence is uncontroverted, and the fact conceded by all parties, that the letter sent to Mr. Middleton was never received by him, but was returned to National Leasing undelivered.
The Fabachers contend that their receipt of this letter, as solidary sureties, coupled with the lessee's failure to make good the delinquent payments by January 19, 1973, as stated in the letter, effectively terminated each of the five contracts, on that date, and rendered applicable certain contract provisions requiring National Leasing to obtain the leased equipment as soon as practicable, sell it for the highest price available, and credit the lessee's account, in accordance with the final accounting provisions of the contracts.
Having carefully examined the testimony and exhibits offered at the trial of this matter, and particularly in view of the clear language in each of the contracts, we are unable to accept appellants' theory. We do not find that the Fabachers' receipt of a copy of the January 5, 1973 letter from National Leasing to its attorney satisfied *483 the contractual requisite that the lessor, electing to terminate the contracts upon lessee's default, so inform the lessee in writing.
In the first place, the text of the letter evidences no intention on the part of National Leasing to exercise its optional right to terminate the contracts. The letter simply authorizes National Leasing's attorney to take necessary steps to obtain payment, and copies were mailed to Mr. Middleton and the Fabachers undoubtedly in the hope that they would take some action to bring the accounts current. Admittedly the letter bears the caption "TEN DAY TERMINATION NOTICE." Nevertheless, we are not disposed, in considering the legal effect to be given this letter, to disregard its content, and place complete reliance upon its caption, which we regard as ambiguous.[7]
Appellants emphasize certain testimony given at trial by National Leasing's accounts manager. They maintain that his testimony shows National Leasing actually intended the January 5, 1973 letter to serve as notice of its election to terminate the contracts. We regard as the best evidence of whether National Leasing intended to terminate the contracts, the text of the letter itself, which does not, in our view, demonstrate an election to terminate them. While the testimony of National Leasing's accounts manager some ten months after the letter was written certainly demonstrates some personal confusion in his mind regarding the legal effect of the letter, National Leasing's actions subsequent to the letter clearly reflect its intention to accelerate and collect payments for the full terms of each contract rather than to terminate them.
Finally, as we previously noted, the letter was never received by the lessee, Family Pools, Inc., or its president, J. Stanley Middleton.[8] Cf. Southern Fleet Leasing Corporation v. McAndrew, 219 So.2d 215 (La.App. 1st Cir. 1969). Nor does the evidence establish that Mr. Middleton or the lessee was informed in any manner that National Leasing regarded the contracts terminated. Lessee remained in possession of the leased equipment, and continued to make sporadic payments on the accounts.
In view of the foregoing, we conclude that National Leasing's letter of January 5, 1973, did not effect a termination of the five contracts. The Fabachers were not entitled to conclude, on the basis of having received a copy of the letter, that the contracts were terminated by National Leasing as of January 19, 1973.

Release of the Sureties
The next question presented by this litigation is whether National Leasing's handling of the Family Pools accounts amounted to an impairment of the Fabachers' subrogation rights under Louisiana Civil Code Article 3061, or otherwise prejudiced them in their status as solidary sureties, and thus entitled them to discharge from their suretyship obligations. In other words, was National Leasing permitted first to accept sporadic payments and then to accelerate the rentals after lessee had long been in default, rather than to exercise its contractual right to terminate the leases, and thereafter obtain the leased equipment and sell it so as to reduce the outstanding liability of the lessee?
The Fabachers' personal liability to National Leasing for payments owed by Family Pools, Inc., rests on the following solidary suretyship agreement, gratuitously executed by them in connection with each of the five contracts sued upon:

*484 "In consideration of the Lessor entering into this lease with the Lessee, the undersigned hereby guarantees and becomes surety for the Lessee in favor of the Lessor for the full and faithful performance of all Lessee's obligations under this lease. This obligation of the undersigned surety is joint, several and in solido with the Lessee. The undersigned shall be bound as if principal obligors for all amounts due under this lease, both for the basic term and for the continued month to month basis thereafter, and consents in advance to all extensions. The undersigned renounce any plea and benefit of discussion or division granted by law to sureties; it is understood and agreed that without this guarantee or surety agreement, Lessor would be unwilling to enter into this contract of lease with the Lessee." (Emphasis supplied.)
Appellants, in addition to obligating themselves in solido with the lessee, expressly consented in advance to all extensions of time given to the lessee by National Leasing. Louisiana Civil Code Article 3063[9] provides that an extension of time granted the principal debtor by the creditor without consent of the surety operates to release the surety, and this right has been held to extend to solidary sureties. See, Jones v. Fleming, 15 La.Ann. 522 (1860); cf. Moriarty v. Bagnetto, 110 La. 598, 34 So. 701 (1903); Hubert, The Nature and Essentials of Conventional Suretyship, 13 Tul.L. Rev. 519, 523 n. 27 (1939); 2 M. Planiol, Traité élémentaire de droit civil, No. 2384 at 354-55 (La.St.Law Inst. transl.1959); Comment, Article 3045 and Solidary Suretyship, 39 Tul.L.Rev. 85, 93-94 (1964). Appellants, however, having expressly consented in advance to all extensions in each surety agreement, cannot complain that the creditor, National Leasing, has not insisted upon timely payment of the rental obligations by the principal debtor, Family Pools, Inc.[10]
Likewise, we do not find that National Leasing's election to accelerate the rentals upon lessee's default, rather than to exercise its contractually authorized option to terminate the lease, effected an impairment of the Fabachers' subrogation to National Leasing's rights, mortgages and privileges within the contemplation of La.C.C. art. 3061.
The only right which the Fabachers contend has been impaired is the right to obtain possession and sell the leased equipment. However, this argument overlooks *485 the fact that Article 3061 provides that the surety is discharged when an act of the creditor causes the surety loss of subrogation to the creditor's rights against the principal debtor. In the instant case National Leasing never acquired the right to repossess and sell the equipment because it did not terminate the lease. By electing to accelerate the payments, and sue for all rentals, under the contract National Leasing could only acquire a judgment against the principal debtor to which the Fabachers' rights of subrogation have not been impaired.
The Fabachers urge, in what we consider to be an alternative argument, that we adopt the findings and reasons for judgment of the trial court. The trial judge found that the contracts were terminated as of January 19, 1973, and that
"* * * [t]he failure of the lessor to comply with the final accounting provisions [of the contracts] and to sell the vehicles in question, prejudiced the rights of the two sureties in that no effort was made by the parties upon default and termination to determine the value of the property and to sell it before there was further depreciation." (Emphasis supplied.)
The theory relied on by the trial judge was that the sureties' obligations were fixed at the time he determined the contracts were terminated, and that National Leasing failed to take steps to protect the sureties' subrogation rights by allowing the equipment to remain in the lessee's handscontinually depreciating in value all the while.
Having concluded that the leases did not end on January 19, 1973, and that the sureties' liabilities were not "fixed" as of that date, we cannot accept the rationale expressed by the trial court and urged on appeal by the Fabachers.
We find that the court of appeal correctly declined to release the Fabachers, as solidary sureties on the contracts, from the obligations they willingly undertook by executing the surety agreements.

Exception of No Cause of Action
The Fabachers filed an exception of no cause of action in the trial court on the ground that the agreements sued upon were not leases but "contracts." The district court referred the exception to the merits and rendered judgment without ruling upon it.
This exception was reurged and a similar one was filed in the court of appeal. On rehearing that court overruled the exceptions because it found the Fabachers had judicially admitted the contracts to be leases in their pleadings. We disagree with the reasoning of the appellate court. Although the Fabachers referred to the contracts as "leases" in responsive pleadings in order to answer plaintiff's allegations which spoke in such terms, we find no evidence that the Fabachers intended to admit that the nature of each contract was, in fact, that of a lease. Nevertheless, the exception was correctly overruled, because whether the principal contract was a lease, conditional sale or an innominate contract, we have concluded that it was sufficient to give rise to a valid obligation enforceable against the Fabachers as solidary sureties.
For the foregoing reasons, the judgment of the Fourth Circuit Court of Appeal is affirmed.
NOTES
[1] Louisiana Civil Code Article 3061 provides:

"The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety."
[2] The following clause found in only one of the five contracts, formed the basis of the district court's ruling that National Leasing could not recover for future rentals on one of the leases:

"* * * if Lessor terminates this lease in writing, as to any item of equipment, Lessee shall not be liable for rent for such item accruing after the date of such termination."
The district court's judgment, however, reserved National Leasing's rights to pursue other claims under that contract.
[3] This award was subject to a credit of $16,491.67, which the evidence demonstrated had been paid to National Leasing by Family Pools, Inc., since suit was filed.
[4] The court of appeal added to the amount of the district court's original judgment $9,825.36, representing National Leasing's claims under contract number 5347, docket number 160-297 in the district court.
[5] Four of the leases additionally specified that the written notice be sent by the lessor to lessee's address as indicated in the contract.
[6] The text of the January 5, 1973 letter read as follows:

"This will be your authority to proceed in the collection of the above leases. We have attempted to obtain the cooperation of our customer, but to no avail.
"At this writing the lessee is in default in the amount of $4,592.53, including the current month that was due on the first.
"Please prepare the necessary papers to protect our interests and hold them in your office until January 19, 1973, in order to give Mr. Middleton one more opportunity to come in and make satisfactory arrangements with Troy W. Chiek, Collection Manager of Louisiana National Leasing Corporation, to avoid further expense and embarrassment. If the past due lease rental payments or other satisfactory arrangements are not make [sic] by January 19, 1973, please proceed at once without further notification.
"A copy of this letter is being sent to Mr. Middleton so that there will be no misunderstanding in this matter."
[7] Although styled as a "termination notice," the letter's caption also contains notice that the outstanding balance on the contracts exceeded $71,000.00. This notation is indicative of National Leasing's intention to accelerate the lessee's obligations, rather than terminate the contracts, and under each contract the two remedies are mutually exclusive. See, Henry Rose Mercantile & Mfg. Co. v. Stearns, 154 La. 946, 98 So. 429 (1923); Mid-Continent Refrigerator Company v. Williams, 285 So.2d 247 (La. App.3d Cir. 1973); Note, 35 La.L.Rev. 644-46 (1975).
[8] Had this letter actually been received by the lessee, a closer question regarding the "terminating effect" of this letter would be presented.
[9] La.C.C. art. 3063 provides:

"The prolongation of the terms granted to the principal debtor without the consent of the surety, operates a discharge of the latter.
[10] "The mere decline in value of property held by the creditor as security is not a basis for discharge of the surety. * * * It has been held that depreciation of collateral after the debt is due but before it is paid is not of itself sufficient to extinguish the surety's obligation. [Commercial Nat'l Bank v. Richardson, 163 La. 933, 113 So. 152 (1927)] The creditor is not required to police the security, particularly when the security is not within his sole control and is readily available to the surety. The surety, if he wishes to protect himself against the danger of collateral losing value, can pay an exigible debt (La.C.C. art. 3056] and execute upon the collateral or, even before paying the debt, can bring an action for security against the principal debtor. [La.C.C. art. 3057]" Slovenko, Suretyship, 39 Tul.L.Rev. 427, 481 (1965).

La.C.C. art. 3056 provides:
"When the surety has paid without being sued and without informing the principal debtor, he shall have no recourse against the latter, provided that, at the time of payment, the debtor was in possession of such means as would have enabled him to have the debt declared extinct; but in this case the surety has recourse to the creditor for restitution."
La.C.C. art. 3057 provides:
"A surety may, even before making any payment, bring suit against the debtor to be indemnified by him:
"1. When there exists a lawsuit against him for payment.
"2. When the debtor has become a bankrupt, or is in a state of insolvency.
"3. When the debtor was bound to discharge him within a certain time.
"4. When the debt has become due by the expiration of the term for which it was contracted.
"5. At the expiration of ten years, when the principal obligation is of a nature to last a longer time; unless the principal obligation, such as that of guardianship, be of a nature not to be extinguished before a determinate time."