387 So.2d 1070 (1980)
FIRST NATIONAL BANK OF CROWLEY
v.
GREEN GARDEN PROCESSING COMPANY, INC., et al.
No. 64974.
Supreme Court of Louisiana.
February 15, 1980.
Rehearing Denied April 7, 1980.
*1071 Kenneth O. Privat, Privat & Regan, Crowley, for defendant-applicant.
Homer Ed Barousse, Jr., Edward, Stefanski & Barousse, Crowley, for plaintiffs-respondents.
MARCUS, Justice.[*]
The First National Bank of Crowley (Bank) instituted this action against Green Garden Processing Company, Inc. (Green Garden) to recover $95,528.12, representing the balance due on a promissory note executed by Green Garden, and for recognition of a collateral mortgage given by Green Garden to the Bank as security for the payment of said indebtedness. Also made party defendants were James B. Blackburn, John R. Leeper and Pierre Jules Maraist, who had executed separate continuing guaranties in the amount of $86,350.00 each.
After suit was filed, one of the guarantors, Leeper, received a discharge in bankruptcy and another, Blackburn, settled with the Bank for $33,000.00. The Bank then proceeded to trial before a jury on its claim against the remaining guarantor, Maraist, and to confirm a judgment of default against Green Garden. A verdict was returned *1072 by the jury in favor of the Bank and against Maraist for $33,000.00 which verdict was subsequently made the judgment of the court. The trial judge rendered a default judgment in favor of the Bank and against Green Garden in the amount of $75,062.66 plus attorney fees of $18,765.66. The judgment also recognized the collateral mortgage held by the Bank. The Bank appealed the judgment against Maraist. The court of appeal amended the judgment to increase the award to the Bank against Maraist to the sum of $57,566.66 plus $12,510.44 as attorney fees and to make his liability in solido with Green Garden.[1] On application of Maraist, we granted certiorari to review the correctness of this decision.[2]
As surety for loans made by the Bank to Green Garden, three shareholders or prospective shareholders of the corporation, James B. Blackburn, John R. Leeper and Pierre Jules Maraist, signed separate but identical documents labeled "Continuing Guaranty."[3] Each guaranty was limited in *1073 amount to $86,350.00 plus interest and attorney fees. When Green Garden failed to pay, the Bank filed suit to recover the indebtedness. After suit was filed, Leeper received a discharge in bankruptcy and Blackburn settled with the Bank for $33,000.00.
The sole issue presented for our consideration is the effect of the release of Blackburn on Maraist's liability under the continuing guaranty agreement.
The agreement signed by Maraist is styled a "Continuing Guaranty." By this contract, he guaranteed the payment of Green Garden's indebtedness to the Bank. We consider the contract to be equivalent to a contract of suretyship. See Brock v. First State Bank & Trust Company, 187 La. 766, 175 So. 569 (1937); Citizens' Bank & Trust Company v. Barthet, 177 La. 652, 148 So. 906 (1933). Accordingly, where the contract is silent, we may look to the provisions of the civil code governing the contract of suretyship to resolve differences between the parties. Where, however, the contract is not silent, the parties are bound by its contents, as agreements legally entered into have the effect of laws on those who have formed them. La.Civ.Code art. 1901;[4]
Louisiana Nat'l Leasing Corp. v. Family Pools, Inc., 345 So.2d 480 (La.1977).
Concerning the Bank's right to release sureties, the Continuing Guaranty provides:

The Bank may, one or more times in its judgment grant extensions, take and surrender securities, accept compositions, release or discharge indorsers, guarantors or other parties, grant releases and discharges generally, make changes of any sort whatever in the terms of the contract or manner of doing business with the debtor and with other parties and securities in relation thereto without notice to the undersigned, such notice being hereby specifically waived. [Emphasis added.]
We consider this provision to give the Bank the right to release sureties as it deems appropriate without affecting its right to full recovery from Maraist of Green Garden's debts up to the dollar limit set in the contract. Because Blackburn is not a party before this court, we need not decide at this time whether, by this provision and by the Bank's release of Blackburn, Maraist lost the right to seek contribution from him.[5] *1074 We are concerned here only with the relationship between the creditor and the surety and not the relationship between the several sureties.
Maraist contends another clause of the contract mandates his discharge. That provision states:
I agree upon demand at any time, to pay to said Bank, its transferees or assigns, the full amount of said indebtedness up to the amount of this guaranty, plus all interest, attorney fees, other fees, and charges, as above set forth, becoming subrogated in the event of payment in full by me to the claim of said Bank, its transferees or assigns, together with whatever security it or they may hold against said indebtedness.
He argues that, because the Bank can no longer subrogate him to its right to collect from Blackburn, he need not pay.
Maraist misconstrues the agreement. It provides that the Bank shall subrogate him to whatever security it "may hold." The Bank did not obligate itself to continue to hold for his benefit securities that it once may have held. Moreover, in the first of the above quoted provisions, Maraist specifically granted the Bank the right to take and surrender securities and to release and discharge guarantors in its judgment.
In sum, we hold that the release of Blackburn by the Bank did not discharge Maraist's liability for the payment in full of Green Garden's indebtedness to the Bank up to the amount of $86,350.00 plus interest and attorney fees.
The trial court rendered judgment against Green Garden in favor of the Bank for $75,062.66[6] plus $18,765.66 as attorney fees. The court of appeal rendered judgment against Maraist in favor of the Bank for $57,566.66 plus $12,510.44 as attorney fees. This amount is within the limits of the continuing guaranty. Accordingly, we must affirm the judgment of the court of appeal.[7]

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed.
SUMMERS, C. J., dissents.
DIXON, J., concurs with reasons.
CALOGERO and DENNIS, JJ., dissent and assign reasons.
DIXON, Justice (concurring).
I respectfully concur in the result reached in the majority opinion, because it appears to me that the bank, by the three separate contracts of continuing guaranty, sought and received as much security as could be obtained from each guarantor, up to the limit expressed in each guaranty.
The contract is so broad in its effort to protect the bank in any contingency that it seems to have suggested exceptions where none exist. Each guarantor obligates himself for the payment of the indebtedness of Green Garden as if he himself (the guarantor) personally owed the money, making himself a party to the principal obligation and agreeing to pay the bank the full amount of Green Garden's debt plus interest and fees, upon demand. Maybe because it is the print is so small that the obligation of Mr. Maraist has not been perfectly clear; nevertheless, the printed words of the contract leave him no room to defend, as long as Green Garden owes the bank: "I do furthermore bind and obligate myself, my heirs and assigns, in solido with said debtor, for payment of the said indebtedness precisely as if the same had been contracted and was due or owing by me in person, *1075 hereby agreeing to and binding myself, my heirs and assigns, by all terms and conditions contained in any note or notes signed or to be signed by said debtor, making myself a party thereto, hereby waiving all notice including notice of any such indebtedness and of demand, presetment (sic), protest or notice of demand or non-payment and of notice and all pleas of discussion and division and I agree upon demand at any time, to pay to said Bank, its transferees or assigns, the full amount of said indebtedness up to the amount of this guaranty, plus all interest, attorney fees, other fees, and charges, as above set forth, becoming subrogated in the event of payment in full by me to the claim of said Bank, its transferees or assigns, together with whatever security it or they may hold against said indebtedness."
CALOGERO, Justice, dissenting.
In my view, the Bank's recovery should be limited to $43,175.00 plus interest and attorney's fees thereon, defendant Maraist's liability for such sums being in solido with Green Garden Processing Co., Inc., for the reasons which I express in detail hereinafter.
I take issue with the majority's interpretation of the provisions of this Continuing Guaranty agreement. (See footnote 3 of the majority opinion for the text of the guaranty). I take issue with the majority's refusal to respect the provisions of the Code on suretyship, in particular La.Civil Code art. 3058. And I also take issue with the majority's conclusion that three continuing guaranties executed simultaneously for $86,350.00 (signed two months after a collateral mortgage note for the exact same amount, $86,350.00, and at a time when only $60,000.00 had been loaned) equals a gross exposure by the guarantors of $259,050.00 or three times $86,350.00 (facilitating the bank's recovering more than $86,350.00, $37,440.75 from Blackburn and $57,566.66 from Maraist). I find this conclusion particularly untenable under the facts of this case, because, here, the Court of Appeal found that the three guarantors were bound for a maximum of $86,350.00 (together) and the plaintiff did not seek writs here on that issue which should have made the issue final. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La.1978); Jordan v. Travelers Lumber Co., 257 La. 995, 245 So.2d 151 (1971); and Footnote 7 of the majority opinion. Furthermore, to allow this result is to permit the Bank to accept Blackburn's $37,440.75 (or $33,000.00 as the Court of Appeal and this Court have mistakenly determined) for an ostensible full release when in fact he is still liable for an additional sum which he will undoubtedly owe Maraist in contribution.
Because I view the facts in some respects differently from the majority (for example, the settlement with Blackburn was for $37,440.75 not $33,000.00) I prefer to recite the facts in full notwithstanding that to some degree they are repetitious of what is in the majority opinion.
On April 8, 1975, Green Garden Processing Co., Inc. executed a Collateral Mortgage Note for $86,350.00. This note was given in pledge to plaintiff to secure a loan. As further security, on June 4, 1975, three shareholders or prospective shareholders of the corporation, James Blackburn, John Leeper and Pierre Jules Maraist, signed separate but identical documents labeled "Continuing Guaranty." These guaranties were executed in favor of plaintiff and were limited in amount up to $86,350.00 (the same amount as the collateral mortgage note) plus interest and attorney's fees. At this time the corporation was indebted to the Bank for $60,000.00. Each guarantor bound himself in solido with the principal debtor, Green Garden. By a note executed by the corporation on May 2, 1977, the corporation's indebtedness to plaintiff was increased to $116,724.00.
Plaintiff instituted this action on November 10, 1977 to recover from Green Garden and the three individual guarantors the indebtedness due by the defendant corporation to the bank. On the date suit was filed, the corporation's debt had been reduced to $95,528.12. On March 1, 1978, Leeper received a discharge in bankruptcy *1076 and was thereafter apparently dismissed from the litigation. The defendant Blackburn was also apparently dismissed by reason of settlement with plaintiff bank, for on August 7, 1978, a motion was filed by plaintiff requesting removal from the court record of the original guaranty executed by Blackburn. In that motion, plaintiff asserted that "this matter has been settled with defendant, James B. Blackburn."[1]
The case proceeded to trial before a civil jury against Maraist only, a default judgment against Green Garden being confirmed on the same trial date. A jury verdict was returned in favor of the bank and against Maraist for $33,000.00 plus interest and costs.
Plaintiff bank appealed, seeking an increase in the award to the full amount of its guaranty. Maraist answered the appeal, contending among other things, that his contract of guaranty was invalid for lack of consideration, and asking that the judgment be reversed. The Court of Appeal concluded that the judgment should be increased from $33,000.00 to $57,566.66 plus $12,510.44 attorney's fees for the following reasons.
The court relied on the case of Louisiana Bank and Trust Co. of Crowley v. Boutte, 309 So.2d 274 (La.1975), interpreting it as requiring that the principal debtor and the individual guarantors all be included in determining the virile shares of each.[2] Thus they concluded that the virile share of each guarantor (Maraist, Blackburn and Leeper) along with the principal debtor, Green Garden, was one-fourth of $86,350.00 and that their shares were increased by Leeper's bankruptcy and consequent exclusion, to one-third. The court further concluded that after the settlement with Blackburn, his virile share (one-third) had to be deducted, leaving Maraist (along with Green Garden) liable solidarily for the remaining two-thirds of the $86,350.00 debt, or $57,566.66. As so amended the Court of Appeal affirmed the judgment of the trial court.
Maraist's first contention in the Court of Appeal, and now in this Court, is that there was no valid consideration to support Maraist's contract of continuing guaranty. The Court of Appeal discussed this contention at length and recited the evidence in the record concerning the facts which gave rise to the execution of the continuing guaranties. I agree with their conclusion that this contention is without merit and the reasons given in their opinion.
Defendant's second contention, in effect that the increase of the award to $57,566.66 is not supported by law and the evidence, is properly before us.
First of all, I believe that the Court of Appeal was correct in finding that the jury's (and trial court's) award of $33,000.00 was clearly wrong. There is simply no rational legal basis for an award in this sum. Presumably the jury chose that figure because it was the same amount which was paid by Blackburn in satisfaction of his obligation to the bank, according to the testimony of the bank's agent Mr. Simoneaux. On the other hand, the Court of Appeal's award of $57,566.66 likewise cannot be substantiated.[3]
*1077 As stated above, in order to gain an extension of credit to Green Garden, three individuals, Blackburn, Leeper and Maraist, stockholders or proposed stockholders of at least 20% of the stock of Green Garden, each signed a continuing guaranty dated June 4, 1975, in favor of the bank. In the guaranties, it was stated that they were executed in consideration of the bank's extending credit to Green Garden. The guaranties were limited, only covering, I believe a maximum of $86,350.00 plus interest and attorney's fees.
The majority opinion, in effect, has concluded that the three guarantors bound themselves for $86,350.00 each, equaling a gross exposure among them of $259,050.00 (three times $86,350.00). I think that a closer analysis of the facts surrounding the signing of these guaranties would lead to the conclusion that the three guarantors together bound themselves for $86,350.00 total. The continuing guaranties were executed less than two months after the execution of a Collateral Mortgage Note for $86,350.00, the exact same amount as the guaranties. The guaranties were executed on the same day, signed by the same notary, and witnessed, with one exception on one instrument, by the same witnesses. At the time the guaranties were signed the corporation only owed the bank $60,000.00. It seems reasonable to assume that if the bank, an institution that deals with these types of transactions regularly, would have intended to secure $259,050.00, it certainly would have clearly stated that intention. This belief is reinforced by the fact that the Court of Appeal found that the total secured was $86,350.00 and the plaintiff did not seek writs here protesting the error of that conclusion. Additionally, since writs were not sought on this issue, it should not be changed by the majority in favor of the plaintiff. (See the majority's own footnote 7 for the authority for this point.)
As stated in the majority opinion, a continuing guaranty agreement is the equivalent of a contract of suretyship, and where the contract is silent we must look to the provisions of the Code governing suretyship to resolve differences between the parties. However, I disagree with the majority's position that the issue presented in this case is expressly covered by the continuing guaranty agreement that was signed by the parties.
The issue in this case, as stated by the majority, is the effect of the Bank's release of Blackburn on Maraist's liability to it.
The majority quotes the following section of the Continuing Guaranty and considers it conclusive on the issue:
"The Bank may, one or more times in its judgment grant extensions, take and surrender securities, accept compositions, release or discharge endorsers, guarantors or other parties, grant releases and discharges generally, make changes of any sort whatever in the terms of the contract or manner of doing business with the debtor and with other parties or securities in relation thereto without notice to the undersigned, such notice being hereby specifically waived." (emphasis provided)
The majority has concluded that this sentence gives the Bank the right to release some sureties without affecting the rights of other co-sureties. I believe this determination is in error. In my view, this sentence deals only with notice requirements. It does no more than give the Bank the right to grant releases and discharges without notice to the signatory. Surely it can not seriously be contended that, by the signatory's waiver of his right to be notified of the release by the Bank of another party, he has waived all his legal rights as a co-surety.
My Brother Dixon, in his concurrence, calls our attention to another sentence in the continuing guaranty. He contends that this sentence makes each signatory a principal obligor on any indebtedness of the corporation. I concede that this would be the *1078 literal meaning of the sentence if it were considered alone. However, it can not be considered in a vacuum. The whole instrument and the intent of the parties must be considered.
This sentence is contained in an instrument which is styled "Continuing Guaranty." As stated by the majority a guaranty is the equivalent of a suretyship. The suggestion that this sentence makes the signatory a principal obligor on any indebtedness of the corporation is absolutely inconsistent with the essence and nature of suretyship. It is of the very nature and essence of suretyship that there is an original principal obligation between a creditor and a debtor upon which the surety makes the accessory promise to the creditor to satisfy the debt if the debtor does not. La.Civ.Code art. 3035. If there is no such accessory obligation then there is no suretyship. The instrument that was signed by Maraist has never been alleged by the plaintiff to be anything other than a guaranty, and it can not be a guaranty and obligate the signatory as a principal obligor at the same time. To allow this result is to allow the Bank to present to the unwary party a document called a Guaranty, to tell him he is becoming a guarantor (as was done in this case) and to have him sign the "Guaranty" only to find out later that he is now a principal obligor.
At the least, this inconsistency creates a clear ambiguity in this instrument and it is well settled that ambiguities in a contract are interpreted against the confector. Kuhn v. Stan A. Plauche Real Estate Company, 249 La. 85, 185 So.2d 210 (1966); and La.Civ.Code art. 1958.
I believe, therefore, that the continuing guaranty is in fact silent on the question of the effects on one co-surety of the Bank's release of another,[4] and being silent, I believe *1079 that the provisions of the Code on Suretyship are controlling.
In every suretyship transaction there is a principal obligation between a creditor and the principal debtor upon which the suretyship is based. La.Civ.Code art. 3035. Then, with respect to the suretyship transaction, there are three separate relationships as recognized by the Code: (1) the relationship between the creditor and the sureties which creates the accessory obligation; (2) the relationship between the principal debtor and the sureties; and (3) the relationship of the sureties among themselves. Each of these relationships is governed by articles contained in separate sections of the Code. Title XVI, Chapter 2, Section 1, Articles 3045-3051; Section 2, Articles 3052-3057; and Section 3, Article 3058, respectively.
The obligation of the principal debtor is, of course, to perform the obligation as he has contracted. The obligation of the surety, generally, is to perform the principal obligation if the principal debtor defaults. La.Civ.Code art. 3035. In a simple suretyship where there is more than one surety, each surety has the right to plead division, requiring the creditor to divide the debt among the sureties, and to collect only their proportionate shares from each. La.Civ. Code art. 3049. The surety also has initially, the right to have the principal debtor's property seized, or discussed, before the surety himself may be called upon to perform. La.Civ.Code art. 3045. However, La.Civ.Code art. 3045 further provides that the surety is allowed to waive this right of discussion by renouncing it, or effectively doing so by binding himself in solido with the principal debtor.
In this latter situation, the creditor can sue the surety on the debt without having first tried to collect from the principal debtor. However, the surety's obligation is still an accessory one and he may in turn recover all of what he has had to pay, from the debtor. La.Civ.Code art. 3052. If there is more than one surety for the same debtor and for the same debt (regardless of whether the sureties are bound in solido as among themselves), although any one of the sureties may be required to pay the whole debt to the creditor, such surety has, in addition to his rights against the debtor, a secondary right of recovery against the other sureties in proportion to the share of each. La.Civ. Code art. 3058.[5]
In the present case, there was a loan transaction between First National Bank and Green Garden, constituting the principal obligation. This principal obligation was secured by the continuing guaranties of Blackburn, Leeper and Maraist. These three sureties each respectively bound themselves in solido with the principal debtor, Green Garden. Their liability, together or separately, was limited to $86,350.00. At the time suit was filed there was an unpaid balance due of $95,528.12. Leeper was discharged in bankruptcy, exonerated from the debt and dismissed from the suit, thereby increasing the proportionate share of the other two sureties to one-half each as between themselves. La.Civ.Code art. 2058. Because each had bound himself in solido with the principal debtor, the creditor could sue either one of the two for the whole amount of the debt (up to the limits of the *1080 guaranty, $86,350.00) with each of them, sureties, having the right to claim contribution over against the other, his co-surety. La.Civ.Code art. 3045; and La.Civ.Code art. 3058. Plaintiff then settled with one of the two, Blackburn, discharging him from the debt. It is the import and/or consequence of this discharge which is at issue in determining the extent of Maraist's remaining liability.
We turn to the applicable section of the Code, Title XVI, Chapter 2, Section 1, "Of the effects of Suretyship Between the Creditor and the Surety," in particular Article 3045, since the sureties here had each bound themselves in solido with the principal debtor. That article provides:
"The obligation of the surety toward the creditor is to pay him in case the debtor should not himself satisfy the debt; and the property of such debtor is to be previously discussed or seized, unless the security should have renounced the plea of discussion, or should be bound in solido jointly with the debtor, in which case the effects of his engagement are to be regulated by the same principles which have been established for debtors in solido." (emphasis provided)
The jurisprudential interpretation of that article requires that the provisions governing solidary obligors be used to determine the effects of the suretyship between the creditor and the surety who has bound himself in solido with the principal debtor. Elmer Candy Co. v. Baumann, 150 So. 427 (La.App.2d Cir. 1933); and Louisiana Bank and Trust Co. of Crowley v. Boutte, supra.
In particular, with respect to the obligations involved between the creditor and the surety when the creditor settles with one of the sureties, La.Civ.Code art. 2203[6] requires the creditor to deduct the portion of the debt of the person to whom he has made the remission, from the total due, and to recover only the rest of the debt from the remaining obligor(s). However, in order to determine the portion of Blackburn's which must be deducted, we have to look to the articles on suretyship, because this question concerns the relationship of the sureties among themselves, and that is governed by the suretyship articles. As stated in Aiavolasiti v. Versailles Gardens Land Dev. Co., 371 So.2d 755 (La.1979) while the relationship of surety to creditor is governed by the principles applicable to solidary obligors when the sureties bind themselves in solido with the principal debtor, "[i]t is an oversimplification of the relationship between the principal debtor, . . . and the individual guarantors to view them as co-debtors in solido for all purposes." 371 So.2d 755 at 758.
Where several sureties for the same debtor and for the same debt, bind themselves in solido with the principal debtor, renouncing the pleas of discussion and division, as was done here, each of them becomes liable to the creditor for the whole of the debt without the creditor having to first execute against the principal debtor. La.Civ.Code art. 3045. However, as between the sureties each surety owes only his virile share and the surety who pays the debt has his remedy against the other sureties for their shares. La.Civ.Code art. 3058.
Therefore, when we subtract the share of the discharged surety, Blackburn, as required by the second paragraph of La.Civ. Code art. 2203 (see footnote 6) We reduce the obligation of the sole remaining surety, Maraist, by one-half.[7]
*1081 At the time of Blackburn's release, the debt due was in excess of $86,350.00, the liability limit as contracted in the guaranty. Maraist's maximum exposure of $86,350.00 was reduced by one-half with the release of the only remaining surety, Blackburn, to $43,175.00, plus a corresponding proportion of the attorney's fees and interest due and owing on Green Garden's debt (the Green Garden note called for 25% attorney's fees and certain prescribed interest).
Inasmuch as the bank prepared the contract and there ware no provisions within the guaranty expressly waiving the surety's rights over against a co-surety, I believe that the contract does not abrogate or change the effects of the Code as outlined above.
Therefore, I respectfully dissent.
NOTES
[*] Honorable Jesse N. Stone, Jr. served as Justice Ad Hoc in the vacancy created by the resignation of Tate, J.
[1] 371 So.2d 1294 (La.App. 3d Cir. 1979).
[2] 373 So.2d 546 (La. 1979).
[3] Each agreement provided as follows:

CONTINUING GUARANTY
BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned witnesses
personally came and appeared:
who do by these presents in CONSIDERATION OF THE FIRST NATIONAL BANK of Crowley, Crowley,
Louisiana, at my (our) request, giving or extending terms of credit to
 GREEN GARDEN PROCESSING COMPANY, INC.
 POINT BLUE, EVANGELINE PARISH, LA. 70586
hereinafter called "debtor." I hereby give this continuing guaranty to the said First National Bank of Crowley, Crowley, Louisiana, hereinafter called "Bank" its transferees or assigns, for the payment in full, of any indebtedness, direct or
contingent whether secured or unsecured, of said debtor to said Bank up to the amount-------- ----EIGHTY SIX THOUSAND THREE HUNDRED FIFTY AND NO CENTS-------------------------DOLLARS,
($ 86.350.00). plus all interest, attorney fees, other fees, and charges of whatsoever nature and kind, whether due or to become due and whether now existing or hereafter arising. The Bank may, one or more times in its judgment grant extensions, take and surrender securities, accept compositions, release or discharge indorsers, guarantors or other parties, grant releases and discharges generally, make changes of any sort whatever in the terms of the contract or manner of doing business with the debtor and with other parties and securities in relation thereto without notice to the undersigned, such notice being hereby specifically waived. The Bank may, without any notice to or consent of the undersigned, also apply all monies received from the debtor and others, or from securities, as it may think best, without in any way being required to marshal securities or assets, and any such application of monies shall not in any way alter, affect, limit or lessen the liability of the undersigned under this Guaranty. The Bank shall not be bound to exhaust its recourse against the debtor or other persons or upon the securities it may hold before being entitled to payment from the undersigned of the amount hereby guaranteed. I do furthermore bind and obligate myself, my heirs and assigns, in solido with said debtor, for payment of the said indebtedness precisely as if the same had been contracted and was due or owing by me in person, hereby agreeing to and binding myself, my heirs and assigns, by all terms and conditions contained in any note or notes signed or to be signed by said debtor, making myself a party thereto, hereby waiving all notice including notice of any such indebtedness and of demand, presentment, protest or notice of demand or non-payment and of notice and all pleas of discussion and division and I agree upon demand at any time, to pay to said Bank, its transferees or assigns, the full amount of said indebtedness up to the amount of this guaranty, plus all interest, attorney fees, other fees, and charges, as above set forth, becoming subrogated in the event of payment in full by me to the claim of said Bank, its transferees or assigns, together with whatever security it or they may hold against said indebtedness.
IN THE EVENT this Continuing Guaranty is executed by more than one individual, it is understood and agreed that each individual shall be bound by all of the provisions of this continuing guaranty and for the payment in full of the entire amount stated above, plus all interest, attorney fees, other fees, and charges of whatever nature and kind in the same manner as if each individual were the only person executing this continuing guaranty. It is understood and agreed that this continuing guaranty does not supersede nor cancel pre-existing guaranty or guaranties given by any of the undersigned on behalf of the borrower named above but to the contrary shall be in addition thereto.
IT IS EXPRESSLY AGREED that this continuing guaranty is absolute and complete, and that acceptance and notice of acceptance thereof by the Bank are therefore unnecessary and they are hereby expressly waived, and the same shall continue in force until written notice of its discontinuance shall be delivered to one of the executive officers of the said Bank, but such discontinuance shall not affect my liability on any debts and/or obligations of the debtor then existing, whether matured or not, nor the liability of any other party in the premises.
THUS DONE, READ AND SIGNED before the witnesses and Notary hereinafter undersigned this 4day ofJUNE, 1975.
WITNESSES:
____________________ ____________________
____________________ ____________________
 ____________________
 ____________________
 ___________________
 Notary Public

[4] La.Civ.Code art. 1901 provides:

Agreements legally entered into have the effect of laws on those who have formed them.
They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.
They must be performed with good faith.
[5] La.Civ.Code art. 3058 provides:

When several persons have been sureties for the same debtor and the same debt, the surety who has satisfied the debt, has his remedy against the other sureties in proportion to the share of each; but this remedy takes place only, when such person has paid in consequence of a lawsuit instituted against him.
[6] This figure represents the amount owed to the Bank, including interest, at the time of the trial. It includes a credit for the amount the Bank received in return for its release of Blackburn ($33,000.00). See La.Civ.Code art. 2206.
[7] We recognize that the judgment of the court of appeal is less than the amount of the judgment against Green Garden and less than the limits of the continuing guaranty. However, we cannot increase the award because the Bank did not appeal. Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La. 1978); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Polizzi v. Lotz, 240 La. 734, 125 So.2d 146 (1960).
[1] There is some conflict in the facts as to the precise amount of Blackburn's settlement. Two different releases (one was attached to the plaintiff's brief to this Court and one was attached to defendant Maraist's brief to this Court) indicated that Blackburn settled upon paying $8,000.00 cash and furnishing a promissory note for $29,440.75 ($37,440.75 total). However, the testimony at trial by plaintiff's witness was to the effect that the bank received $33,000.00 in payment from Blackburn. The bank's ledger sheet, which was filed into evidence, shows a payment of $29,440.75 and a payment of $3,559.25, which together come to $33,000.00 (in addition to certain other unidentified payments or credits). However, for reasons stated later in this dissent, I do not feel that the exact amount of the settlement is critical to the determination of the issues presented.
[2] This particular issue was not addressed in Boutte. As indicated in footnote two of that opinion, the question of the amount of each surety's virile share was not before the Court.
[3] Interestingly, not even the bank's own ledger sheet reflected a balance on the principal debt that large. While the facts are a bit confusing, it is evident from the bank's ledger relating to this loan transaction, that after crediting various payments, including the two by Blackburn totalling $33,000.00, there was on August 25, 1978, the date of the last entry, a balance due of only $48,354.81.
[4] There are two other provisions in the continuing guaranty which could arguably be read to constitute an implied waiver of some of the rights of a surety; however, in view of the intent of the parties at the time of entering into the contract (that this was to be a guaranty or suretyship) we find that those provisions do not expressly or impliedly state that the signatories thereon agreed to forego the legal rights of a co-surety established by the Civil Code.

The first of these provisions states:
"The Bank, may without any notice to or consent of the undersigned, also apply all monies received from the debtor and others, or from securities, as it may think best, without in any way being required to marshal securities or assets, and any such application of monies shall not in any way alter, affect, limit or lessen the liability of the undersigned under this Guaranty."
The most likely meaning and/or intention of this language is that the bank reserves the right to apportion money received in connection with any debt of the prime debtor to such loan or loans of the debtor as it sees fit, without the signatory having the right to complain if not first applied to the debt upon which the signatory is the guarantor.
Given its literal application, the language is nonsensical in at least one situation. Where there is only one debt of the debtor and a payment is applied, surely this language can not mean that the bank may receive it without in any way altering, affecting, limiting or lessening the liability of the signatory, for the signatory can not be made to pay $86,350.00 if the debt has been reduced below that sum by credited payments, by whatever source.
Furthermore, there is nothing inconsistent in having the bank receive and apply money without its affecting the signatory's legal obligation to the bank, on the one hand, and the signatory's retaining the rights and privileges over against a co-surety as given him by the Code. What purports to hurt the bank here is not merely the receipt and application of a payment, but rather the bank's releasing the co-surety with the attendant effect upon the right of the remaining co-surety. There is nothing in the continuing guaranty about the bank's having the right to release a surety notwithstanding the adverse legal effect upon a remaining co-surety.
The third provision comprises the third to last paragraph of the instrument and reads as follows:
"IN THE EVENT this Continuing Guaranty is executed by more than one individual, it is understood and agreed that each individual shall be bound by all of the provisions of this continuing guaranty and for the payment in full of the entire amount stated above, plus all interest, attorney fees, other fees, and charges of whatever nature and kind in the same manner as if each individual were the only person executing this continuing guaranty. It is understood and agreed that this continuing guaranty does not supersede nor cancel pre-existing guaranty or guaranties given by any of the undersigned on behalf of the borrower named above but to the contrary shall be in addition thereto."
This section is by its terms applicable only if a given continuing guaranty instrument is executed by more than one individual. That was not the case here as each continuing guaranty was signed separately by the respective sureties. Furthermore, and more significantly, the import of the paragraph is simply to assure that if there is more than one signatory (or surety), each will be bound for the full $86,350.00 as between each surety and the creditor. This provision, like the two provisions above, does not indicate that the signatory waived his rights as a co-surety against his fellow co-sureties for contribution. If it did so provide, it would be inconsistent with an earlier provision in the contract recognizing the signatory's rights of subrogation to any claims of the bank, and as such it would create ambiguity in the contract which, as stated above, is to be interpreted against the confector. Kuhn v. Stan A. Plauche Real Estate Co., supra.
[5] La.Civ.Code art. 3058 provides as follows:

"When several persons have been sureties for the same debtor and for the same debt, the surety who has satisfied the debt, has his remedy against the other sureties in proportion to the share of each; but this remedy takes place only, when such person has paid in consequence of a lawsuit instituted against them."
[6] La.Civ.Code art. 2203 provides:

"The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.
"In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission."
[7] The principal debtor is not counted as a co-obligor in determining each surety's share of the debt. Suretyship is an accessory obligation. La.Civ.Code art. 3035. The surety binds himself for another who is already bound. The principal debtor remains liable for the whole of the debt no matter how may sureties secure that debt. The principal debtor's share of the debt is never less than the entirety (as between him and one or more of the sureties) irrespective of the release of one or more sureties. The sureties have a right to collect the whole of what they are forced to pay, from the principal debtor, and not merely a virile share. La.Civ. Code art. 3052. The principal debtor never becomes a solidary obligor with the sureties in the sense that as between them they are equally liable. He always remains liable for the whole debt, and the surety who pays the debt may recover the whole from him. This is the surety's primary source of recovery. As a secondary source of recovery, the surety who has paid the debt may recover a proportionate share from each of the other sureties, and the proportions are determined by the number of sureties. La.Civ.Code art. 3058.