**Ruben Clayton BOYTER et ux**

**v.**

**SHREVEPORT BANK & TRUST et al.**

**In re Ruben Clayton BOYTER and Mattie Faye Boyter, Debtors.**

Civ. A. No. 86–0062.
Bankruptcy No. 583–01360.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Oct. 16, 1986.

James J. Thornton, Johnston & Thornton, Shreveport, La., for appellants.

Glenn E. Walker, Burnett, Sutton, Walker & Calloway, Shreveport, La., for appellees, Mr. and Mrs. Boyter.

## MEMORANDUM OPINION

STAGG, Chief Judge.

### I INTRODUCTION

This appeal from the bankruptcy court presents a tangled web of issues involving suretyship, pledge, *in solido* liability, subrogation, and community property law. The threads of this web must be unravelled, examined and, ultimately, rewoven to achieve a just resolution under the Code.

Pledge and suretyship form part of the Louisiana Civil Code's arsenal of security devices. Although these methods of financing are of ancient origin, courts, commentators and economic necessity have, through the years, consistently given them

---

**3.** *See* S.M. Kassin, *An Empirical Study of Rule 11 Sanctions* (Federal Judiciary Center 1985).

new life. *See* Nathan, *The Civil Code and Modern Methods of Financing*, 50 Tul.L. Rev. 583 (1976). Considered in isolation, a *pure* pledge or a *pure* suretyship issue is easily resolved under the Code. When solidary liability overlays the suretyship or when more than one security device is used in the same transaction, dispute resolution becomes more difficult.

## II  FACTS

### A  1978 COLLATERAL PACKAGES

On June 8, 1978, Ruben Clayton Boyter ("Boyter") executed a collateral mortgage note to the order of future holder, due on demand, in principal sum of $77,500, with 10 per cent interest and collection costs. This note was paraphed for identification with an act of collateral mortgage of the same date ("First Collateral Mortgage"). This collateral mortgage covered a 29.12–acre tract of immovable property owned by Boyter and his wife, Mattie Faye Frizzell Boyter ("Mrs. Boyter"). Under former Civil Code art. 2404, the mortgage was executed by Boyter alone, acting as head and master of the community. Boyter pledged the collateral mortgage note to the Shreveport Bank and Trust Company ("Bank") "to secure the payment of any note, interest and costs, as well as any other debt now due or which may hereafter arise or become due...."

Also on June 8, 1978, Boyter and Joseph Robert Cook ("Cook") executed a collateral mortgage note to the order of future holder, due on demand, in principal sum of $77,500, with 10 per cent interest and collection costs. This note was paraphed for identification with an act of collateral mortgage of the same date ("Second Collateral Mortgage"). This collateral mortgage covered a 10–acre tract and a 29.26–acre tract of immovable property which were owned in indivision by two marital communities, one existing between the Boyters and the other, between Cook and his wife. This mortgage was executed by Ruben Boyter and Joseph Cook under the former head and master provisions. This collateral mortgage note was also pledged by them to

the Bank under the same terms as the First Collateral Mortgage note.

These notes, mortgages and pledges formed "collateral packages" which the Bank used to provide security for advances made to Boyter, individually, and to Alloy Casting of Louisiana, Inc. ("Alloy Casting"), a company in which Boyter and Cook were officers and shareholders.

On August 12, 1980, Mr. and Mrs. Cook sold their one-half interest in the 10–acre and 29.1–acre tracts covered by the Second Collateral Mortgage to Mr. and Mrs. Boyter. After this transaction, all of the mortgaged property was owned in its entirety by the Boyters. Additionally, in August 1980, John M. Goff ("Goff") and G.O. Coleman ("Coleman") became shareholders and officers of Alloy Casting.

### B  1981 LOAN

On February 12, 1981, Alloy Casting, through one of its officers, signed a hand note in the principal sum of $77,500 payable to bearer at the Bank, with interest at 1 per cent above the Bank's prime rate as adjusted quarterly. This note was endorsed by four of Alloy Casting's shareholders: Boyter, Goff, Coleman and Grover G. Carlisle. These four endorsers were sureties for Alloy Casting and were bound *in solido* with the corporation for payment. The parties stipulate that "as among themselves as sureties[,] no endorser intended to be bound for more than his virile share." The parties further stipulate that at the time Goff and Coleman signed the note, "They were on the advisory board of the Shreveport Bank & Trust, Mr. Goff was a CPA, and both he and Mr. Coleman were experienced businessmen."

The face of this 1981 note states:

> X  This note is executed conformably to a separate agreement of pledge and is secured by the collateral described in that agreement.

> X  This note is secured by pledge of the collateral securities listed upon the reverse side hereof, and in the event of the failure of payment of this note in accordance with its terms, or in the

event of the breach of any covenant in any mortgage securing this note, then the holder is authorized to sell such securities at private sale and to apply the proceeds of such sale to the payment of the indebtedness due.

On the reverse side of the note, a section entitled "Pledged Collateral" provides:

The following collateral securities have been delivered in pledge to secure the payment of the obligations represented by the note of which this is the reverse side, and it is agreed that the transfer or assignment of said note together with such securities shall release the original payee from any responsibility with regard to such securities; ....

Listed below this pledge provision were the two collateral pledges of June 8, 1978. The "Pledged Collateral" section was signed by Boyter alone.

In addition to the monies advanced to Alloy Casting, the Bank also made loans to the Boyters, individually. On July 10, 1981, Boyter executed a hand note for $24,000 secured by a pledge of the collateral mortgages of June 8, 1978 covering the 10–, 29.26– and 29.12–acre tracts. On June 20, 1983, Boyter executed another note for $35,000. This note was secured by the pledge of a collateral mortgage note dated May 19, 1980 paraphed for identification with a mortgage of the same date in which Mr. and Mrs. Boyter granted an additional $150,000 collateral mortgage on the 29.12–acre tract.

## C  DEFAULT AND SUBSEQUENT PROCEEDINGS

When the Alloy Casting debt fell into default, the Bank called on the endorsers to pay the balance due. On May 2, 1983, Goff and Coleman paid the Bank $77,500 toward the principal and $6,792.65 in accrued interest, as the amount owed by Alloy Casting on the corporation's February 21, 1981 note. Goff and Coleman paid no attorney's fees or other collection costs. The same date that they paid the note, Goff, Coleman and the Bank entered into an "Act of Subrogation" in which the Bank assigned its rights in the Alloy Casting note to Coleman

and Goff. These parties also signed a second agreement which apportioned each party's ownership interest in the collateral. This apportionment was required because the three tracts of land had been mortgaged and the notes pledged to secure numerous notes representing both the debt of the corporation and of Boyter, individually.

On May 4, 1983, the Bank, Goff and Coleman filed a petition for executory process against Alloy Casting and Ruben Boyter. The suit was brought on the two collateral mortgage notes of June 8, 1978. The petitioners sought to recover the combined indebtedness due on the individual hand notes signed July 10, 1981, January 20, 1983 and the Alloy Casting note being the sum of $185,978.71 plus costs.

The property was advertised and a date for the public sale was set; however, on June 29, 1983, Alloy Casting filed a voluntary petition for Chapter 11 reorganization under the United States Bankruptcy Act. The petition for bankruptcy resulted in an automatic stay of the executory process proceedings. On August 29, 1983, the stay order was dismissed on the ground that Alloy Casting had no interest in the property. The property was then re-advertised and a new date for public sale was set. On October 4, 1983, Boyter and his wife filed a voluntary petition for Chapter 11 reorganization. State court executory process proceedings were again stayed.

The Bank, Goff and Coleman filed proof of claims with the bankruptcy court. The Boyters filed an adversary proceeding attacking the validity of those claims. Goff and Coleman sought to recover:

(a) the entirety of the $77,500.00 principal that they paid on May 2, 1983, to liquidate the Alloy Casting hand note; and

(b) the June 8, 1978, collateral mortgage note interest rate of 10% on $77,500.00 from that date until paid; and

(c) attorneys fees of 15% on both principal and interest, pursuant to the provisions of the June 8, 1978, collateral mortgage notes.

The Boyters contended Goff and Coleman were entitled to recover only:

(a) One-fourth (¼) of $77,500.00 as principal, which amounts to $19,375.00. This is premised upon the fact that there were four accommodation endorsers (sureties) on the corporate hand note.

(b) One-fourth (¼) of $6,792.65, which was the interest accrued on the corporate hand note through the Goff-Coleman payoff of May 2, 1983. This sum amounts to $1,698.16. Opponents deny that interest may itself be recovered on this sum, inasmuch as same would amount to "interest on interest."

The adversary proceeding was tried on stipulated facts and the bankruptcy court held that Goff and Coleman were entitled to recover from Boyter only one-fourth of the total amount paid to the Bank on the Alloy Casting note and that this claim was unsecured. Goff and Coleman filed a timely appeal of this judgment by the bankruptcy court.

## III RIGHTS AGAINST THE COLLATERAL PACKAGE

■ Goff and Coleman argue that they are entitled to recover the entire amount paid on the Alloy Casting note as the subrogees of the Bank. The Boyters contend that Goff and Coleman may recover only one-fourth of that amount. The Boyters submit that their liability is founded solely on Reuben Boyter's status as surety on the note. The bankruptcy court correctly rejected Goff and Coleman's contention that they are entitled to recover the full amount paid as transferees of the note.

## A RIGHTS AGAINST BOYTER AS SURETY

"[I]t is well settled that a person who endorses a note solely for the purposes of accommodating the maker is presumed to have done so as surety for the maker." *Aiavolasiti v. Versailles Gardens Land Development Co.*, 371 So.2d 755, 760 (La. 1979); *C.I.T. Co. v. Rosenstock*, 205 So.2d 81 (La.App. 4th Cir.1967); *Continental Supply Co. v. Fisher*, 150 La. 890, 91 So. 287 (1922). As sureties, they bound themselves to pay Alloy Casting's debt "in case the debtor should not himself satisfy the debt." La.Civ.Code art. 3045. By binding themselves *in solido* with Alloy Casting, the principal debtor, each surety was "liable for the whole performance." La.Civ. Code art. 1794 (Rev.1984) (former art. 2091 (1870)). The Bank could, therefore, sue either the debtor or any one of the sureties for the entire amount of the loan. *Louisiana Bank and Trust Co. v. Boutte*, 309 So.2d 274 (La.1975).

However, as among the sureties themselves, the legal relationships are governed by the rules of suretyship. *Aiavolasiti*, 371 So.2d at 758; *Koeniger v. Lentz*, 462 So.2d 228, 229 (La.App. 4th Cir.1984). Under article 3058[1] of the Civil Code, the surety who has paid the debt "has his remedy against each of the other sureties for each surety's proportionate share of the amount paid."[2] *Aiavolasiti*, 371 So.2d at 758. Thus, the Civil Code gives the surety who pays a right to claim "contribution" from his co-sureties with each surety liable for a virile portion of the debt paid. *Id.*

1. "Although this article permits contribution only if the debt was paid in consequence of a lawsuit, this does not prevent plaintiff's recovery in the present suit. Contribution is permitted even if the debt was not paid in response to a lawsuit provided that the co-sureties had knowledge that the debt was due or consented to the payment. *Leigh v. Wright*, 192 La. 224, 187 So. 649 (1939). The other guarantors clearly had knowledge that the debt was due in the present case, and no possible defense was suggested at trial. Moreover, since all of the guarantors were bound in solido with the principal debtor, there is no reason to require the delay pending lawsuit. *See, Louisiana Bank and Trust Co., Crowley v. Boutte*, 309 So.2d 274, 279 (La. 1975)." *Aiavolasiti*, 371 So.2d at 759 n. 7.

2. By express contractual provision, the surety may agree to be bound for more than his virile share. *First National Bank of Crowley v. Green Garden Processing Co.*, 387 So.2d 1070 (La. 1980). This exception does not apply in this case because the parties stipulated that as sureties they intended to be bound for no more than a virile share.

Although the sureties are bound *in solido* with the principal debtor, the debtor is not counted in assessing the virile shares of the sureties. *Id.* at 759–60. Thus, when there are four sureties on a note, the surety who fulfills performance is entitled to recover a one-fourth contribution of the amount paid from each of his co-sureties.

The surety may not enlarge his right of contribution through conventional subrogation. *Koeniger,* 462 So.2d at 229. Thus, if a co-surety not only pays the debt of the principal debtor but also purchases the note or otherwise contracts for subrogation to the creditor's rights, he is still entitled to recover no more than a virile share from any co-surety. *Aiavolasiti,* 371 So.2d at 758, 760; *Koeniger,* 462 So.2d at 229; *see also* La.Civ.Code art. 1804 (Rev.1984) (former arts. 2104, 2106 and 2103 (1870)) and La.Civ.Code art. 1830 (Rev.1984). Clearly, Goff and Coleman's "Act of Subrogation" and their status as transferees of the note is irrelevant with regard to their claim against Boyter, a co-surety on the note.

Common sense dictates this result. All accommodation endorsers, *i.e.,* sureties, agree to be liable for full payment of the note if the principal debtor defaults and are further liable for contribution to the co-surety who actually pays the creditor. Thus, each surety's ultimate liability may be fixed at his virile share of the note. If one of several sureties, as here, could purchase the note (or otherwise contractually subrogate to the creditor's rights) and then collect the full amount of the note from a co-surety, the purchasing surety would thereby escape liability for his virile portion of the debt. If Goff and Coleman were able to succeed on their theory, then upon the debtor's default, every surety would race to the bank to purchase the note. The Civil Code does not contemplate that a surety's liability should be premised upon the fortuity of being the first to purchase the debtor's note. Nor did the parties intend such a result when they signed the note as endorsers. Thus, the bankruptcy court correctly ruled that Ruben Clayton Boyter, *as surety,* was liable for only one-fourth of the amount paid and that Goff and Coleman's claim for contribution from him, *as surety,* was unsecured. *See* La. Civ.Code art. 3041 (1870) (no mortgage presumed on surety's property).

## B RIGHTS AGAINST BOYTER AS PLEDGOR—A MATTER OF FIRST IMPRESSION

The difficult problem in this case—and the feature which distinguishes it from the *Aiavolasiti* and *Koeniger* cases, *supra* —is the fact, that in addition to being a surety, Boyter also signed an act of pledge in which two collateral mortgage packages were delivered to the Bank to secure the corporate indebtedness of Alloy Casting. The existence of this security, given *in addition to* the endorsements, implicates the right of legal subrogation accorded by law to the surety who pays the principal debtor's obligation.

The surety who has paid the debt has a right to seek reimbursement from the principal debtor for the entire amount paid. La.Civ.Code art. 3052. The Civil Code reinforces this right of "reimbursement" by providing that "the surety has the same right of action and the same privilege of subrogation, which the law grants to co-debtors *in solido.*" La.Civ.Code art. 3053. The surety who pays is said to "step into the shoes of the creditor," and "may avail himself of the action and security of the original obligee against the obligor." La. Civ.Code art. 1826 (Rev.1984). Thus, the surety who pays the debt is subrogated by law to the original creditor's rights. La. Civ.Code art. 1829 (Rev.1984) (former art. 2161 (1870)). Thus, the question of first impression posed by this case is whether the rules of legal subrogation[3] should be applied (thus permitting Goff and Coleman to avail themselves of the security pledged by Boyter) or whether the rules of surety-

---

**3.** Conventional subrogation is not implicated because one who is subrogated by law "may not recover more by invoking conventional subro-

gation." La.Civ.Code art. 1830 (Rev.1984); *see also Aiavolasiti* and *Koeniger, supra.*

ship should be applied (thereby limiting them to their right to claim only a proportionate contribution from Boyter).

This court believes that if presented with this issue, a Louisiana court would hold that the rules of suretyship and not the rules of subrogation would be applied. This conclusion would be altered *if* the property had been pledged or mortgaged by the principal debtor, Alloy Casting. If the corporation had been the pledgor, the rules of legal subrogation would apply, and Goff and Coleman would be entitled to proceed against the property in accordance with their right to seek 100 per cent reimbursement from the debtor.

However, the property was not pledged by the Alloy Casting but by Boyter, a co-surety, and Louisiana courts have uniformly held that as between sureties, the rules of suretyship apply. These courts have rejected the ingenious arguments made by the surety who pays to recover more than a virile share from his co-surety. *See Aiavolasiti* and *Koeniger, supra.* To apply the rules of subrogation—thereby allowing Goff and Coleman to recover the full amount of the debt paid from a sale of Boyter's pledged property—would permit them to do indirectly what cannot be done directly: *i.e.*, it would allow 100 per cent contribution from a co-surety instead of limiting the co-surety's liability to his virile share. While Goff and Coleman have the right to proceed against the pledged security, they may recover only Boyter's proportionate share, not the full amount.

### C  THE DOCTRINE OF REAL SURETYSHIP [4]

The conclusion that rules of subrogation would not be applied by Louisiana courts is supported by the doctrine of "real suretyship." French commentators draw a distinction between "personal" sureties and "real" sureties. A "personal surety" is the surety defined in both the French and Louisiana Civil codes as a person who bind

himself for another and promises to pay the creditor if the principal debtor does not. La.Civ.Code art. 3035; Fr.Civ.Code art. 2011. Planiol defined the "real surety" as "a person who, to guarantee the debt of another, mortgages his immovable without obligating himself personally; the creditor therefore acquires the right to enforce the mortgage but there is no personal action against this surety; wherefore, the name given to him." Vol. 2, Part 2 Planiol, *Traité élémentaire de droit civil* § 2368 at 350 (1959 Tr. Louisiana State Law Institute). *See also* T. 2 Baudry-Lacantinerie, *Traité de droit civil français* § 1292 (3d ed. 1906).

The French commentators have resolved the conflict between the real surety and the personal surety who pays the debt in the following manner: the personal surety cannot recover full reimbursement from the real surety's property, rather "[t]here is only an equitable solution and that is to treat them alike and to divide the debt between them...." *Planiol, supra* § 2368 at 351 (citing Fr.Civ.Code art. 2033 which is the source for La.Civ.Code art. 3058). In effect, the French commentators have recognized a reciprocal right, between the real and personal surety, to seek contribution. Baudry-Lacantinerie has noted that the person who mortgages his property to secure the debt of another is treated "comme une caution au point de vue du recours réciproque, que la caution personnelle et cette caution réelle sont admises à exercer l'une contre l'autre, lorsque l'une d'elles a acquitté la dette." Baudry-Lacantinerie, *supra* § 1292 at 407 (like a surety from the point of view of the reciprocal recourse that the personal surety and this real surety are said to exercise one against the other, when one of them has paid the debt).

In enforcing this reciprocal right of contribution, the question becomes how to divide the debt between them. Planiol succinctly explains the rule as follows:

**4.** I wish to acknowledge, with thanks, the research and translation by senior law clerk Marie Breaux Stroud. My stumbling, junior college French would never survive publication. I trust that hers will.

If the immovable mortgaged is worth more than the amount of the debt, as the creditor could demand the total from each they divide the sum half each. If not, it is necessary to estimate what the real surety risks to lose, whose obligation is limited to the value of the immovable and divide the debt proportionally. For example if the debt is 20,000 francs and the immovable is worth only 10,000, the real surety who was risking one-half less than the other will only be responsible for a third of the debt....

Planiol, *supra* § 2368 at 351. Laurent, and Aubry and Rau offer substantially the same example. *See* 18 Laurent, *Principes de droit civil français* § 126 at 160 (3d ed. 1878); 1 *Civil Law Translations*, Aubry & Rau, *Droit civil français* § 321 at 207–08 n. 86 and 87 (1965 Tr.La.St.L.Inst.).

No French commentator researched for this court has used an example in which there was one real surety and more than one personal surety, as in the case at bar in which there are four personal sureties. This omission opens a very interesting question of how to divide the debt between the real surety and the multiple personal sureties. Should they all be counted and the debt divided proportionately? In this case, the division would result in a one-fifth contribution from the real surety. Or should Boyter as both a real and personal surety be counted only once? One might also ask how the existence of a real surety affects the right of contribution among the personal sureties. One could argue that the real surety should be counted in assessing the proportionate share of the non-paying sureties' contribution to the personal surety who has paid the debt. Because this court concludes hereinafter that, under the community property law, the sureties who have paid the debt cannot proceed *in rem* against the property subject to the collateral mortgage which was pledged to secure the Alloy Casting note, this court will leave these difficult questions for resolution by others.

The important point of this discussion of the doctrine of real suretyship is that our French brothers in the civil law do not apply the rules of subrogation in a situation analogous to the facts presented here. In both the case of the real surety discussed by the commentators and in the facts *sub judice*, there is property which is mortgaged or pledged by an individual to secure the debt of another. Both this court and the commentators have concluded that it would be inequitable to apply the rules of subrogation thereby allowing the personal surety to recover the full amount paid from the property mortgaged or pledged, as the case may be.

## D RIGHTS AGAINST THE PROPERTY

■ Goff and Coleman also appeal the bankruptcy court's determination that their claim against Boyter was unsecured. The Boyters contend that Goff and Coleman cannot proceed against the property covered by the collateral mortgage notes because, *inter alia*, Mrs. Boyter did not concur in the pledge of the notes. The bankruptcy court concluded that: "Goff and Coleman can not foreclose on the immovable property pledged by Mr. Boyter because Goff and Coleman did not purchase the mortgage in question. Louisiana law precludes the surety on an obligation from arguing he is a 'purchaser' under the circumstances of this case." Op. at 6. For reasons other than those assigned by the bankruptcy court, this court concludes that Goff and Coleman may not foreclose on the property covered by the collateral mortgage notes.

Goff and Coleman *do* have some rights against the property pledged by Boyter to secure the Alloy Casting note. However, their right to proceed is limited to Boyter's proportionate contribution due to his co-sureties who have paid the debt. *See* section II(C) above. Nevertheless, this court finds that the recently amended provisions of Louisiana community property law preclude Goff and Coleman from foreclosing on that property.

The acts of collateral mortgage, the collateral mortgage notes and the first pledge

of those notes occurred on June 8, 1978. Although the property covered by the collateral mortgages was community property, Boyter could legally mortgage this community property without his wife's consent under Louisiana's now-repealed "head and master" law. *See* 17 La.Civ.Code Ann. art. 2404 (West 1973). The repledge of the collateral mortgage notes took place on February 21, 1981, over a full year after Louisiana's new regime of joint management became effective and over a year after the United States Court of Appeals for the Fifth Circuit struck down the "head and master" law as being an unconstitutional violation of the Fourteenth Amendment's equal protection guarantee. *See Kirchberg v. Feenstra*, 609 F.2d 727 (5th Cir.1979), *aff'd*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). The new joint management regime in Louisiana's community property law requires both spouses to join in the disposition of community property. Article 2347 provides, in pertinent part: "The concurrence of both spouses is required for the alienation, *encumbrance*, or lease of community immovables...." La. Civ.Code art. 2347 (Rev.1979) (emphasis added). The repledge of the collateral mortgage notes in February 1981 without the concurrence of Mrs. Boyter violated Louisiana's requirement that both spouses must concur in the encumbrance of a community immovable and, accordingly, the repledge of February 1981 is null. *See* La. Civ.Code art. 2353 (Rev.1979).

All of the changes in Louisiana's "head and master" law—whether legislative or judicial in origin—operate prospectively. *See Kirchberg, supra; Crook v. White*, 393 So.2d 782 (La.App. 2d Cir.1981); 1979 La. Acts No. 709 § 13. Thus, the collateral mortgages themselves are valid because they were executed in 1978. *See, e.g., Crook v. White*, 393 So.2d at 785. However, the validity of the mortgages is not questioned in this case. Rather, the issue before the court is whether the repledge of the collateral mortgage note in 1981, *after* the effective date of new article 2347, is valid.

The parties do not contest the fact that the repledge of these collateral mortgage notes encumbers the community property. The repledge of these notes increased the amount of debt for which the property was liable *in rem*. Because the repledge of the note encumbered the property with additional debt, Mrs. Boyter's concurrence was required by article 2347. The Bank did not obtain her concurrence, and the repledge of the collateral mortgage notes is void. La. Civ.Code art. 2353.

The fact that delivery is the only formality required for the pledge of a note under article 3158 is immaterial to the issue of whether community property law requires the spouse's concurrence in the pledge of that note. Article 2347 does not require the spouse's *signature*, nor does it contain an exception for transactions not required to be reduced to writing. The Louisiana legislature could have drafted article 2347 to require the spouse's written consent; but it did not. *See* La.Civ.Code art. 2334 (Rev.1977) (now repealed which required "the wife's written authority or consent"). The legislature could also have drafted article 2347 to exclude contracts not reduced to writing, but it did not do this, either. Under articles 2347 and 2353, as drafted, no one would seriously argue that a verbal lease of immovable property made by a wife acting alone is not voidable by the husband under articles 2347 and 2353.

There are important public policy and constitutional concerns which counsel against an overly narrow interpretation of the "encumbrances" which require a spouse's concurrence. The policy behind Louisiana's community property law has been fundamentally altered by the rejection of the "head and master" concept and the adoption of joint management. This policy is reinforced by the constitutional prohibition against denying one spouse the equal protection of the law. Creditors contract with only one spouse in a community property state at their own risk. The Bank could easily have protected its rights by either securing Mrs. Boyter's concurrence or by securing a renunciation of her right to concur thereby allowing Boyter alone to

continue to repledge the collateral mortgage notes. *See* La.Civ.Code art. 2348.

The Louisiana Fourth Circuit Court of Appeal reached a contrary conclusion in *American Bank v. Red Diamond Supply Co.*, 402 So.2d 729 (La.App. 4th Cir.1981). The *Red Diamond* court concluded that the validity of a collateral mortgage was not affected by the failure of the wife to join in the execution of the handnote after the effective date of now repealed article 2334. This article provided: "Where the title to immovable property stands in the names of both the husband and wife, it may not be leased, mortgaged or sold by the husband without the wife's written authority or consent." There are a number of distinctions between the now-repealed article 2334 and the new community property regime of joint management. These distinctions make the *Red Diamond* case inapplicable to the case at bar. First, article 2334 was a narrow exception to the "head and master" rule. It only applied to property standing in the names of both spouses. Thus, the *Red Diamond* court was not concerned with a public policy in favor of joint management. Second, article 2334 did not require the wife's consent for encumbrances of community immovables. The article applicable in this case is more broadly drafted than the former article 2334, and this is a crucial distinction between *Red Diamond* and the present case. Article 2347 requires both spouse's concurrence for the encumbrance of a community immovable. The repledge of a collateral mortgage note on a new loan is an encumbrance for which the bank did not secure Mrs. Boyter's concurrence. Accordingly, that repledge is void.

## IV CONCLUSION

Goff and Coleman are entitled to a one-fourth contribution from Boyter as a co-surety on the Alloy Casting debt. This claim is unsecured. Although they have a right to proceed against the collateral notes pledged by Boyter as additional security on the note, Goff and Coleman may not foreclose on the property covered by these notes because Mrs. Boyter did not concur in the repledge of these notes as required by the joint management rules of Louisiana's community property law. Accordingly, the judgment of the bankruptcy court is AFFIRMED.

An order consistent with the terms of this memorandum opinion shall issue herewith.