

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00188-CV

———————————————

CL III FUNDING HOLDING COMPANY, LLC, Appellant

V.

STEELHEAD MIDSTREAM PARTNERS, LLC; STRATEGIC ENERGY
INCOME FUND III, LP; EAGLERIDGE ENERGY II, LLC; AND
EAGLERIDGE MIDSTREAM, LLC, Appellees

---

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-293713-17

---

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Opinion by Chief Justice Sudderth

## OPINION

This case centers on the "[h]ighly fractured and contentious" relationship between two pipeline co-owners—Appellant CL III Funding Holding Company, LLC and Appellee Strategic Energy Income Fund III, LP—along with the co-owners' predecessors and successors in interest.

CL and Strategic co-owned a pipeline and related easements (together, the Property), but the Property was subject to a statutory lien because the previous owners had not fully paid the pipeline construction company. Strategic took the position that CL bore sole, principal liability for the debt underlying this lien, but CL disagreed. Nonetheless, CL settled the debt with the pipeline construction company. Rather than releasing the statutory lien, though, CL acquired the lien by assignment and filed suit in Montague County to foreclose on its co-owner for the full amount of the debt. Strategic—together with its pipeline operator (Appellee Steelhead Midstream Partners, LLC) and later joined by its successors in interest (Appellees EagleRidge Energy II, LLC and EagleRidge Midstream, LLC, collectively, EagleRidge)—filed a concurrent suit in Tarrant County, alleging that CL's foreclosure action violated the parties' pipeline operating agreement because the agreement required CL to pay its own obligations.

The foreclosure suit proceeded first, and CL prevailed. The foreclosure court held that CL had the authority to enforce the statutory lien and to collect the full amount of the pipeline construction debt, and it ordered the Property sold to satisfy that debt. EagleRidge—which by then had purchased the entirety of the Property—paid the

2

foreclosure judgment to avoid a sheriff's sale. Instead of appealing the foreclosure judgment, EagleRidge—together with Strategic and Steelhead—sought to recover the amount it had paid to satisfy the foreclosure judgment as damages in the then-pending Tarrant County breach of contract action. And that is precisely what happened.

The Tarrant County court held that CL's foreclosure of Strategic's Property interest breached its pipeline operating agreement because CL had contractually agreed to pay its own obligations and because CL's foreclosure action held Strategic responsible for CL's "sole" debt.

But if CL had been solely, principally liable for the pipeline debt, it could not have foreclosed on Strategic's interest in the Property, and it could not have recovered the entirety of the pipeline debt in the foreclosure proceeding. The foreclosure judgment necessarily established that CL was legally entitled to collect the pipeline debt, meaning that CL was, at a minimum, not the principal debtor with "sole" individual liability for that debt. Because the present breach of contract suit is premised on CL's alleged status as the sole, principal debtor and on CL's corresponding lack of legal authority to foreclose, this breach of contract suit is an impermissible collateral attack on the foreclosure judgment. We will reverse and render.

## I. Background

### A. U.S. Energy–WBH Joint Operating Agreement (2011)

In 2011, Strategic's predecessor, U.S. Energy Development Corp. entered into a joint operating agreement with CL's predecessor, WBH Energy, L.P., to develop oil and

3

gas leases in Montague County. The two entities each owned a fifty-percent working interest in the leases. Under the operating agreement, the two entities operated the wells through a WBH sister company—WBH Energy Partners, LLC.

Acting as the operator, WBH Energy Partners then contracted with Orr Construction Inc. to build a pipeline that would move natural gas from the wells to a point of sale. The operator obtained easements for the Orr pipeline,[1] and while the operator agreed to pay Orr's invoices, it did not do so. Although U.S. Energy paid the operator its share of the construction costs, WBH did not pay its share, and the operator did not pay Orr the full amount owed.[2] WBH—including its operator sister company—filed for bankruptcy shortly thereafter.

**B.    WBH Bankruptcy (2015)**

In the bankruptcy proceeding, U.S. Energy filed claims based on the operator's failure to pay vendors such as Orr, and Orr filed a claim for its unpaid construction costs. Meanwhile, Orr also filed a statutory lien encumbering the Property as security

---

[1]The operator listed only itself as the owner of the easements in the Montague County property records. And at trial, U.S. Energy's representative testified that the operator never assigned the pipeline easements to U.S. Energy.

[2]In late 2014, U.S. Energy learned that the operator was not paying vendors, and U.S. Energy obtained a temporary court order allowing it to take over operations. For purposes of this case, though, we will continue to refer to WBH Energy Partners as the operator.

4

for its $413,030 in unpaid construction costs. *See* Tex. Prop. Code Ann. §§ 56.001–.045.

CL—WBH's credit lender—wanted to purchase WBH's pipeline-related assets (including its fifty-percent interest in the Property), but it developed an "[a]dversarial" relationship with U.S. Energy during the bankruptcy proceeding.[3] One of the numerous conflicts between the two entities stemmed from CL's attempt to hold U.S. Energy responsible for certain debts related to the Property.[4]

Ultimately, CL and U.S. Energy reached a mediated settlement agreement that was approved by the bankruptcy court. The settlement provided that U.S. Energy would not oppose CL's acquisition of WBH's fifty-percent interest in the Property and that CL would "[r]elease any claims . . . acquired in connection with the sale of accounts receivable by [the operator] to CL . . . for non-payment by [U.S. Energy] of joint interest billings by [the operator] to WBH LP."

---

[3]In the bankruptcy proceeding, CL and U.S. Energy disputed the priority of various claims that they each had against WBH's assets.

[4]At trial, the parties gave differing descriptions of the debts that led to the settlement. U.S. Energy's representative testified that CL expected U.S. Energy to pay off WBH's debts, while CL claimed that U.S. Energy had owed the operator approximately $12 million separate and apart from WBH's debts.

CL then acquired WBH's interest in the Property. That interest was still subject to the Orr lien,[5] and the parties dispute whether CL assumed personal liability for the Orr debt as part of this acquisition.

**C.    Montague Agreement (2015)**

Meanwhile, through a series of transactions, U.S. Energy transferred its interests to two affiliates: Strategic (with U.S. Energy as its managing general partner) took over ownership of U.S. Energy's fifty percent of the Property, and Steelhead (which was owned by U.S. Energy) served as the pipeline operator. CL, Strategic, and Steelhead entered into a contract—the Montague Agreement—regarding the operation of the pipeline. As relevant here, Article 9.2 of the Montague Agreement states that each co-owner "shall bear its respective Participating Interest of the costs and expenses," and Article 10.6 states that each co-owner will "be liable only for its Participating Interest

---

[5]The bankruptcy court order approving CL's purchase of WBH's Property interest states:

> [Orr] asserts a Senior Prior Lien on certain of the Pipeline Assets (as defined in the PSA) and the Debtors are selling the collateral which is subject to Orr's asserted Senior Prior Lien to CL III. The Purchased Assets shall be sold to CL III subject to any Senior Prior Lien that Orr may have against such collateral.

*See also Nova Mud, Inc. v. Staley*, 583 S.W.3d 728, 736 (Tex. App.—El Paso 2019, pet. denied) (recognizing that, "[o]rdinarily, liens survive bankruptcy proceedings unscathed, meaning that secured creditors can still enforce liens even after personal debt is discharged").

6

of the costs"; each will "be several[ly], not joint[ly] or collective[ly]" liable; and each will "act in good faith in their dealings with each other with respect to activities hereunder."[6]

### D.   CL's Montague County Foreclosure Suit (2016)

Approximately eight months later, through a mediated settlement agreement, CL paid Orr $350,000 to settle the $413,030 in unpaid construction costs. As part of the settlement, Orr assigned CL its rights to the debt and to the statutory lien securing that debt.

CL, in turn, sought to enforce the lien and collect the full amount of the Orr debt—$413,030—by filing a Montague County foreclosure action against Strategic and its related entities.[7] From Strategic's perspective, CL had assumed individual liability for its predecessor's (WBH's) debt, and it had released U.S. Energy from liability as part of the bankruptcy settlement. CL's foreclosure action, according to Strategic, was attempting to force Strategic to pay CL's sole debt in violation of the Montague Agreement.

---

[6]Many aspects of the Montague Agreement mirror American Association of Professional Landmen Form 610. *See* 7 William B. Burford, *West's Texas Forms: Minerals, Oil & Gas* § 13:1 (4th ed. 2021).

[7]CL originally filed its foreclosure action against U.S. Energy, but it subsequently amended its petition to name Strategic and Steelhead as additional defendants. After EagleRidge purchased the Property, CL added it as a defendant as well.

**E.    Tarrant County Lawsuit (2017)**

While the foreclosure suit was pending, Strategic and Steelhead sued CL in Tarrant County.  In a joint pretrial order, Strategic summarized the basis for its suit: "CL III breached the Montague Agreement because CL III alone owed the unpaid Orr construction costs and thereby failed to pay its proportionate share of the Montague Pipeline's expenses."

**F.    EagleRidge's Entrance (2017–2018)**

To add complexity, while the Montague County foreclosure suit and the Tarrant County breach of contract suit were still pending, CL, U.S. Energy,[8] Strategic, and Steelhead all sold their Property interests to EagleRidge Energy, and EagleRidge Energy assigned its interests to its subsidiary, EagleRidge Midstream.  In the sale, CL agreed to release the Orr lien to the extent that it encumbered its own share of the Property, but it did not release the lien on Strategic's share of the Property.[9]  Consequently, CL added

_____

[8]Although U.S. Energy had previously transferred its Property ownership interest to Strategic, both U.S. Energy and Strategic—joined by Steelhead and several "affiliated partnerships"—signed a global bill of sale conveying a collection of property interests to EagleRidge.  The bill of sale conveyed, among other things, Strategic's ownership interest in the Property, Steelhead's operating rights to the Property, and "[a]ll records and files to the extent specifically related to the Propert[y]."

[9]During its trial of the contract suit, EagleRidge complained that CL had "signed a release of lien, and they put in the purchase and sale agreement between CL III and EagleRidge that they were only going to pursue the interest of U.S. Energy," but CL then "foreclose[d] on the entire pipeline, putting the entire ownership, one hundred percent of it, in danger . . . and basically doing the opposite of what they represent[]ed

8

EagleRidge as a Property owner and defendant in the foreclosure suit, and EagleRidge

joined the Tarrant County contract suit as Strategic's successor in interest.[10]

## G.    CL's Foreclosure Judgment (2019)[11]

Ultimately, CL was successful in its Montague County foreclosure suit.  Although

U.S. Energy and Strategic claimed that they were not responsible for the Orr debt, the

foreclosure court determined that the Orr lien encumbered Strategic's interest in the

Property and was "valid, perfected, [and] enforceable" against Strategic.[12]    After

---

to them during negotiations."  EagleRidge has not filed a claim against CL for breach of its sale agreement—at least not in this proceeding.

[10]U.S. Energy's and EagleRidge's representatives testified that Strategic had assigned EagleRidge its rights in the Montague Agreement as well as its related breach of contract action.  U.S. Energy's representative further stated that, as part of Strategic's sale to EagleRidge, Strategic agreed to indemnify EagleRidge for its defense of the Property against the Orr lien and to set aside money to pay off at least a portion of the Orr debt.

[11]Although EagleRidge's acquisition of the Property took effect before the foreclosure judgment was entered, we refer to the fifty-percent Property interest previously owned by Strategic as Strategic's Property interest to distinguish it from the fifty-percent Property interest previously owned by CL.

[12]The foreclosure judgment describes the Orr lien as "encumber[ing] EagleRidge Energy's interests in the Encumbered Property," and it orders a sale of the "Encumbered Property."   The parties dispute whether the term "Encumbered Property" encompasses the entirety of the Property or only Strategic's fifty-percent undivided interest.  During the trial for breach of contract, Appellees took the former position, and the trial court's findings of fact adopt that interpretation of the foreclosure judgment.

But as CL has noted, the foreclosure judgment incorporates the foreclosure court's previous summary judgment order, in which it defined the term "Encumbered Property" as Strategic's fifty-percent interest in the Property.   Interpreting the

9

dismissing U.S. Energy's counterclaims—in which U.S. Energy sought to foreclose a different lien against CL's Property interest—the foreclosure court ordered the sheriff to sell Strategic's share of the Property at a foreclosure sale "with the proceeds thereof to be paid to CL III and applied against the Subject Lien Indebtedness." It also authorized CL to "credit bid any or all of the [$413,030] Subject Lien Indebtedness to purchase the Encumbered Property at any such foreclosure sale." In other words, CL was legally entitled to collect or receive credit for the full amount of the $413,030 Orr debt.

To avoid foreclosure, EagleRidge paid the judgment, including CL's attorneys' fees.[13] Although EagleRidge initially appealed, it voluntarily dismissed that appeal

---

foreclosure judgment based on this incorporated, defined term resolves the otherwise-present conflict between the summary judgment order and the final foreclosure judgment. This interpretation also resolves the otherwise-present conflict between the foreclosure judgment and the notice of the foreclosure sale, as the notice limits the sale to Strategic's fifty-percent interest and does so using language substantially similar to the declared definition of "Encumbered Property."

The interpretation of a judgment is a question of law, so we are not bound by the trial court's understanding of the foreclosure judgment. *See Winton v. Winton*, No. 05-91-00149-CV, 1992 WL 33176, at *1 (Tex. App.—Dallas Feb. 18, 1992, writ denied) (not designated for publication); *see also State Farm Lloyds, Inc. v. Williams*, 791 S.W.2d 542, 546 (Tex. App.—Dallas 1990, writ denied) ("The same rules of interpretation apply in ascertaining the meaning of judgments as in ascertaining the meaning of other written instruments."). Nonetheless, we need not decide this question as it is immaterial to the resolution of this appeal. *See* Tex. R. App. P. 47.1.

[13]In the letter accompanying EagleRidge's payment of the foreclosure judgment, it stated that it was paying "under protest and under duress."

10

before briefing.[14] *See U.S. Energy Dev. Corp. v. CL III Funding Holding Co., LLC*, No. 02-20-00007-CV, 2020 WL 479583, at \*1 (Tex. App.—Fort Worth Jan. 30, 2020, no pet.) (per curiam) (mem. op.).

## H. Tarrant County Trial and Judgment (2020)[15]

Back in Tarrant County, the breach of contract case proceeded to a bench trial, and the trial court concluded that CL had breached Articles 9.2 and 10.6 of the Montague Agreement because CL "was individually obligated to pay for the Orr Lien" but "fail[ed] to pay its sole obligation for $413,030 of the unpaid Orr construction costs."[16] The trial court supported its ruling with detailed findings of fact and

---

[14]Plaintiffs later explained that "there would have been no point" to appealing the foreclosure judgment because "the only thing that could have been appealed was did [the Orr lien] encumber the proper easements and was it for the proper amount, [and t]hat wasn't at issue[—t]he only issue was [that CL wa]s the wrong party to bring that lawsuit."

[15]Plaintiffs presented evidence that WBH's bankruptcy was still ongoing at the time of trial in November 2020. After submission of this case, CL asked us to take judicial notice of the bankruptcy court's February 2020 order approving the final distribution of WBH's assets. In this order, the Orr lien is listed among the allowed claims against WBH's bankruptcy estate, and the bankruptcy court approved a proportional distribution of WBH's assets to compensate CL for its now-unsecured $413,030 claim. Strategic argues that CL's judicial notice request presents evidence outside the record and offers an inaccurate representation of the bankruptcy proceedings. We need not address CL's judicial notice request to resolve this appeal, so we decline to do so. *See* Tex. R. App. P. 47.1 (directing court of appeals to hand down an opinion "as brief as practicable but that addresses every issue . . . necessary to final disposition of the appeal").

[16]In 2019, while this case was pending before the trial court, the Texas Supreme Court decided *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*. *See* 576 S.W.3d 362, 369–70 (Tex. 2019) (recognizing that "a contractual duty to act in good faith does

11

conclusions of law. It awarded U.S. Energy, Strategic, Steelhead, and EagleRidge (collectively, Plaintiffs[17]) approximately $2 million—a figure that included (1) attorneys' fees incurred in the foreclosure suit, (2) litigation costs to satisfy the foreclosure judgment, and (3) attorneys' fees in the Tarrant County lawsuit. The trial court also awarded 18% prejudgment interest.

## II. Discussion

CL lists seven issues on appeal,[18] several of which share a central, decisive theme: the present case is, to use CL's words, "a true collateral attack" on the foreclosure judgment. CL raises this in multiple ways, including in its second argument, which

---

not create a new obligation or independent cause of action; instead, it merely governs the conduct by which the party must fulfill the contractual obligation to which it applies").

[17]Although U.S. Energy was not technically a plaintiff in the Tarrant County case, its interests were substantially aligned with those of Strategic and the trial court awarded U.S. Energy damages in its judgment.

[18]CL lists seven issues, but its brief has ten sections containing nine arguments: (1) whether the Montague Agreement prohibited CL's foreclosure action as a matter of law; (2) whether there was sufficient evidence that CL violated the Montague Agreement; (3) whether the trial court could award, as actual damages, attorneys' fees and litigation expenses incurred in the prior foreclosure suit; (4) whether the trial court's judgment violated the Montague Agreement's ban on special, consequential, and indirect damages; (5) whether Plaintiffs waived their right to recover the foreclosure judgment by paying it and dismissing their appeal; (6) whether nonparties to the Montague Agreement (i.e., U.S. Energy and EagleRidge) could recover damages for breach of contract; (7) whether CL was liable for contract damages that accrued after it sold its Property interests to EagleRidge; (8) whether the award of attorney's fees was excessive; and (9) whether the award of 18% interest violates Texas law.

12

challenges the legal sufficiency of the evidence to prove that it was solely liable for the entirety of the Orr debt, and in its fifth argument, which claims that Plaintiffs waived their challenge to the foreclosure judgment by paying it and dismissing their appeal. We agree; because Plaintiffs' breach of contract claim centers on CL's sole individual liability for the Orr debt, and because that allegation seeks to undermine the foreclosure judgment's essential determination that CL was legally entitled to collect the Orr debt from Plaintiffs, the current lawsuit is an impermissible collateral attack.

## A.   The alleged breach centers on CL's sole liability for the Orr debt and CL's wrongful collection of that debt from the non-liable Plaintiffs.

Plaintiffs' breach of contract claim is premised on their position that CL bore sole, principal liability for the Orr debt. At trial, they reasoned that U.S. Energy had paid its share of the Orr invoices; that WBH alone was liable for the debt; that CL had "agreed to release any claims that U.S. Energy . . . . had to pay . . . for the unpaid debts of the prior owner, WBH"; and that when CL had purchased WBH's Property interest, it did so subject to the Orr lien, meaning that it "assum[ed] the lien that Orr put on the pipeline and all of the liability that WBH had that led to this lien" and became "individually liable" for the Orr debt.[19] Based on this premise, Plaintiffs alleged that

----

[19]In a trial brief, Plaintiffs recognized the pivotal nature of their sole-liability theory, arguing that if they were not allowed to offer the CL—U.S. Energy bankruptcy settlement into evidence "to demonstrate that the debt belonged solely to CL III, and was not a joint expense of the Pipeline," then the trial court would be hindered in "assess[ing] who the debt belonged to," and "Plaintiff[s] w[ould] be unable to prosecute their affirmative claims."

13

CL's foreclosure of the Orr lien violated CL's commitments under Articles 9.2 and 10.6 of the Montague Agreement to "bear its respective Participating Interest of the costs and expenses" and to hold Strategic "responsible only for its [own] obligations."[20]

The trial court's findings of fact reflect that it agreed with Plaintiffs' theory of breach.[21] The trial court found that CL breached the Montague Agreement by "failing to pay its sole obligation for $413,030 of the unpaid Orr construction costs" and

---

[20]Plaintiffs asserted additional theories of breach as well, one of which was that the Montague Agreement prohibited the co-owners from putting liens on the Property that subjected the other co-owner's interest to the risk of foreclosure unless the liens were "Permitted Liens." Plaintiffs raise their "Permitted Liens" theory to support the judgment on appeal as well.

But the trial court's findings and conclusions do not state that CL breached the "Permitted Liens" portion of the Montague Agreement.

Furthermore, it is unclear what provision in the Montague Agreement prohibits owners from holding or asserting non-"Permitted Liens." The Montague Agreement defined the term "Permitted Liens" and required the operator, Steelhead, to protect the Property from non-"Permitted Liens," but it did not impose a corresponding duty on the owners.

Plus, U.S. Energy's representative testified and the documentary evidence showed that, when CL filed its foreclosure action, U.S. Energy asserted a lien on CL's Property interests as well.

[21]The trial court also found that CL had "*only* purchased the right to assert the [Orr] claim against WBH's 50% ownership rights and Easements" and "acquired no rights to assert the Orr [lien] against US Energy or Strategic's ownership interest in the Montague County Pipeline Easements." This directly contradicts the foreclosure court's determination that CL "h[e]ld[] a valid, perfected and enforceable mineral contractor lien . . . that attach[ed] to and encumber[ed] EagleRidge Energy's interests in [Strategic's fifty-percent of the Property]." Regardless, Plaintiffs now acknowledge that the Orr lien encumbered their Property interest.

14

"seeking in bad faith to enforce the Orr Lien against its non-encumbered co-System Owner's 50% ownership interest." The trial court stated that "CL III agreed that U.S. Energy was not responsible for any alleged failure to pay for Orr Construction costs, and that CL III gave up its right to make any such claim against U.S. Energy." The trial court concluded that CL's foreclosure violated its contractual commitment "as a 50% owner of the [Property], to pay 50% of the expenses relating to the ownership and operation of the [Property]" because "[u]nder Articles 9.2 and 10.6, CL III was individually obligated to pay for the Orr Lien" and "[u]nder Article 10.6, no other System Owner (i.e., Strategic) had any responsibility to pay [CL's] share of that expense." The breach of contract judgment thus turns on the trial court's conclusions that CL bore "sole," "individual[]" liability for the Orr debt and that "no other System Owner (i.e., Strategic) had any responsibilities" to pay the Orr debt.

But if CL had been solely, individually responsible for the Orr debt, then how could CL have legally foreclosed on its co-owner's Property interest to enforce the Orr lien, and how could it have recovered the entirety of the Orr debt from Plaintiffs out of the foreclosure proceeds? It could not have. The breach of contract judgment and the foreclosure judgment cannot both be valid.

15

**B.    Had CL been solely, principally liable for the Orr debt, it could not have foreclosed or recovered the entire amount of the Orr debt.**

If CL had been solely, principally liable for the Orr debt, then Strategic would have effectively been CL's surety.  And a principal debtor cannot recover its own debt from its surety—even if it attempts to do so as the lienholder's assignee.

**1.    If CL had assumed sole individual liability for the Orr debt, then Strategic would effectively have been a surety.**

When common property is encumbered for the debt of one co-owner, the non-debtor is a surety—its property is pledged to pay for the debt of another.  *See Dalton v. Rainey*, 75 Tex. 516, 520, 13 S.W. 34, 35 (1889) (recognizing "that property mortgaged . . . by any person to secure the debt of another, the mortgagor not being bound for the debt, or, if bound, only as a surety, will be treated as a surety, and released under the same circumstances that a personal surety would be").  "A surety is a party who promises to answer for the debt of another," *cf. Crimmins v. Lowry*, 691 S.W.2d 582, 585 (Tex. 1985), and while "[o]rdinarily, a surety binds itself personally for the debt or default of the principal," the surety may instead pledge "property as security for the payment of a debt or performance of an obligation by another, . . . and to the extent of such person's interest in the property[,] that person occupies the position of surety and is entitled to all the rights and privileges of a surety," 68 Tex. Jur. 3d *Suretyship and Guaranty* § 2 (2022).  In *State Fidelity Mortgage Co. v. Varner*, for example, Carolyn Ford pledged five certificates of deposit as collateral to secure her husband's business associate's promissory note.  740 S.W.2d 477, 478–79 (Tex. App.—Houston [1st Dist.]

16

1987, writ denied). When the business associate defaulted on the note, the bank foreclosed on Ford's certificates of deposit. *Id.* at 479. The court of appeals held that, because Ford pledged the certificates "as security for the debt of another, she occupied the position of a surety to the extent of the property pledged." *Id.* at 480–81.

The surety relationship can also arise based on an agreement between debtors if one debtor agrees to assume full liability for the amount owed:

> One may be a surety with respect to a co-obligor while with respect to the creditor the surety is a principal debtor and may be treated as such. As between themselves, therefore, the relation of principal and surety arises where the purchaser of property assumes payment of a note executed by the vendor for the purchase price. In addition, as between a purchaser and the grantor, a purchaser who has assumed an existing mortgage is primarily liable for the mortgage debt, and the mortgagor is bound as surety.

68 Tex. Jur. 3d *Suretyship and Guaranty* § 10 (2022).

Here, Plaintiffs no longer dispute that Strategic's undivided one-half interest in the Property was encumbered by the Orr lien, regardless of who was personally liable for the $413,030 debt underlying that lien. Indeed, this is one of the reasons Plaintiffs gave at oral argument for dismissing their appeal of the foreclosure judgment—whether the lien "encumber[ed] the proper easements . . . wasn't at issue." Therefore, if CL had borne sole, principal liability for the underlying Orr debt and if Strategic's Property interest had been pledged to secure CL's debt, then Strategic would have effectively been a surety for CL's sole debt.

17

### 2. If CL had been solely responsible for the Orr debt, its acquisition of the debt could not have shifted its liability to its surety.

A debtor cannot recover from its surety for its own debt—even if the debtor acquires that debt by assignment.

### a. A surety has secondary liability, and the principal debtor is liable to its surety if the surety pays the debt.

Principal debtors and sureties have a vertical relationship with one another; even if both parties are directly liable to the creditor, between themselves the principal debtor bears primary liability while the surety bears secondary liability.[22]  *Great Am. Ins. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418–19 (Tex. 1995) (discussing sureties in commercial bond context and stating that "the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal"); 68 Tex. Jur. 3d *Suretyship and Guaranty* § 2 (2022) (similar).  Consistent with this relationship, Texas courts have long recognized that, if a surety is called to perform on a principal debtor's behalf, the surety is entitled to reimbursement and is subrogated to the rights of the creditor:

> [W]here the surety pays the debt of the principal, he has his election to either pursue his legal remedies and bring an action on an assumpsit, or the obligation implied by law in his favor for reimbursement by the principal; or he can prosecute an action on the very debt itself, and in

---

[22]Our reference to secondary liability refers only to the relationship between the principal debtor and the surety.  As noted above, a creditor may consider both parties to be principal obligors even though—as between the two parties—one of the two has assumed sole principal liability and the other secondary.  *See* 68 Tex. Jur. 3d *Suretyship and Guaranty* § 3 (2022).

> either event he stands in the shoes of the original creditor as to any securities and rights of priority.[23]

*Fox*, 119 Tex. at 517, 35 S.W.2d at 681; *see Crimmins*, 691 S.W.2d at 585 (noting that "equity confers the right of subrogation" and the surety "can bring an action on the debt itself against his principal and foreclose on collateral given as security for the note"); *State Fid. Mortg. Co.*, 740 S.W.2d at 480 ("In general, a surety who has paid the debt of her principal is subrogated to a right of action against the principal for the debt so paid."); *Gaines v. Gaines*, 119 S.W.2d 427, 430 (Tex. App.—Fort Worth 1938, no writ) ("[T]he surety who pays is entitled to recover back from his principal the whole amount paid."). For example, in the case discussed above—*State Fidelity Mortgage Co. v. Varner*—after Ford "discharged [the business associate's] debt through the compelled foreclosure sale of her certificates of deposit, she had a right of action against the principal . . . for the value of the pledged certificates of deposit." 740 S.W.2d at 480–81. Not only could she maintain a lawsuit on the promissory note, but she could also assign her interest in the note to another. *Id.* A surety's payment of a debt is, in this sense, "equivalent to a purchase by the surety of the note." *Gaines*, 119 S.W.2d at 430. But the right to subrogation does not require a formal assignment of the note and

---

[23]The surety's right to its election of remedies does not mean there is no difference between the procedural requirements for and ramifications of those remedies. *Cf. Fox v. Kroeger*, 119 Tex. 511, 513–14, 517–18, 35 S.W.2d 679, 679, 681–82 (Tex. [Comm'n Op.] 1931) (holding that surety could sue on note itself where reimbursement claim was time-barred but promissory note claim was not).

instead automatically arises from equity. *Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 517 (Tex. App.—Dallas 2007, no pet.).

### b. Similarly, co-debtors or co-sureties are liable to one another for their proportional shares of a shared debt.

Just as sureties can recover from principal debtors based on their vertical relationship, co-debtors who share principal liability for a debt can recover their proportional shares from one another based on their horizontal relationship. *See Orr v. Broussard*, 565 S.W.3d 415, 420 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (recognizing that "a co-obligor who discharges more than his share of the common obligation may seek equitable contribution from his co-obligors"); *Gaines*, 119 S.W.2d at 430 (noting that a debtor can "recover against his joint principal the latter's pro rata part of the obligation"); *cf.* 83 C.J.S. *Subrogation* § 52 (2022) (recognizing general rule that "[a] joint debtor who discharges more than [its] share of the common debt generally has a right to compel contribution by way of subrogation"). The co-debtor "occupies a hybrid status" in this regard; it "is in the position of a surety to the extent that [it] promises to answer for the portion of the debt that benefited [its] fellow co[-debtor] but is not a surety for the portion of the debt for which [it] personally benefited."[24] *Crimmins*, 691 S.W.2d at 585.

---

[24]*But cf. Gaines*, 119 S.W.2d at 430 (stating that payment "by a surety, does not discharge the obligation; it is equivalent to a purchase by the surety of the note," but "[w]hen one of two or more joint makers pays, he may only recover against his joint

The same is true of co-sureties; they can recover from one another in proportion to their shares of secondary liability. *See Byrd v. Estate of Nelms*, 154 S.W.3d 149, 165 (Tex. App.—Waco 2004, pet. denied). And just as a surety who pays a debt can step into the shoes of the creditor to collect from the principal, so too can a co-debtor or co-surety step into the shoes of the creditor to collect the proportional shares owed by its co-debtors or co-sureties. *Crimmins*, 691 S.W.2d at 585 (recognizing that, "upon payment or satisfaction, the co[-]maker assumes the rights of a transferee of the note" and "is subrogated to the rights of the creditor and may sue on the instrument and foreclose the collateral to the extent of his right of contribution"); *Byrd*, 154 S.W.3d at 163 (noting that "[i]ssues of suretyship and guaranty were decided long ago in Texas legal history," including "recognizing that a surety must contribute to [a] fellow co-surety's payment of the underlying debt"); *Magruder v. Johnston*, 233 S.W. 665, 666 (Tex. App.—Texarkana 1921, writ ref'd) (recognizing that, generally, "[a] tenant in common, who acquires an outstanding incumbrance against the common property . . . may foreclose it in the event the other cotenants fail or refuse to contribute their proportionate part to the discharge of the common debt").

But the co-debtor or co-surety who pays the whole debt cannot recover for its own share of the liability; the right to subrogation is limited to the extent of its co-

---

principal the latter's pro rata part of the obligation, upon the implied promise" and "cannot recover on the note for it is discharged").

debtors' or co-sureties' liability. *Bradford Partners*, 231 S.W.3d at 518 ("A co-surety is only entitled to his contributive share."); *Byrd*, 154 S.W.3d at 163 (referencing longstanding case law "holding [that a] surety has no right to compel fellow co-sureties to contribute more than their proportionate share[s]"); *cf. Niday v. Cochran*, 93 S.W. 1027, 1029 (Tex. App.—Galveston 1905, no writ) (op. on reh'g) ("[I]f one tenant in common discharges incumbrances or purchases claims which are a charge upon the common title, he thereby acquires an equitable lien upon the co-tenant's interest *to the extent of the co-tenant's liability*." (emphasis added)).

### c. A principal debtor cannot recover from its surety.

Given that a paying surety can collect from the principal debtor and that co-sureties or co-debtors can collect their proportional shares from one another, it almost goes without saying that a principal debtor cannot collect from its surety, and that a *sole*, principal debtor cannot collect from anyone. E.H. Schopler, *Contribution, Subrogation, and Similar Rights, as Between Cotenants, Where One Pays the Other's Share of Sum Owing on Mortgage or Other Lien*, 48 A.L.R.2d 1305, § 3(d) (1956) (recognizing that the subrogation applicable to co-debtors "does not apply where, at the time of the payment, the paying cotenant is primarily liable for the debt secured by the lien"). "If one joint debtor has assumed the obligation of paying the entire debt, so that among or between the debtors the assuming debtor occupies the position of principal and the other debtor or debtors the position of sureties," then "should payment be made by the one who is ultimately obliged to discharge the debt, no right of subrogation can arise." 83 C.J.S. *Subrogation*

22

§ 52 (2022). In such instances, the paying party is the one ultimately responsible for the debt, so it is not entitled to reimbursement for paying its own debt.

Nor does the law allow the principal debtor to do indirectly what it cannot do directly. In *Cecil v. Dollar*, for example, Amy Cecil and Bill Dollar each owned one-half of the mineral rights in a large tract of land, and Dollar agreed to assume liability for a $2,000 note that encumbered the entirety of the mineral estate. 147 Tex. 541, 543–44, 218 S.W.2d 448, 449 (1949). Dollar thus bore principal liability for the $2,000 debt, but Cecil's one-half interest was still pledged as a surety to secure the debt. Dollar then defaulted and allowed the property to be foreclosed upon with the intention of purchasing Cecil's interest at the foreclosure sale. *Id.* at 544, 218 S.W.2d at 449–50. Cecil filed a trespass to try title action, and after she lost in the trial court, she took her case to the Texas Supreme Court, complaining that Dollar was "estopped to rely upon his failure to fulfill his contractual obligation, and to assert an adverse title to the mineral interest derived from his purchase at the trustee sale brought about by his own default." *Id.* at 543, 218 S.W.2d at 449. The Supreme Court agreed, reiterating "the equitable principle that no one should profit by his own default." *Id.* at 545–46, 218 S.W.2d at 450–51 (quoting *Conn. Gen. Life Ins. Co. v. Bryson*, 148 Tex. 86, 91, 219 S.W.2d 799, 801 (1949)).

Thus, a debtor bearing sole, principal liability for a debt secured by a surety's property interest cannot recover from the surety—the debtor has no right to equitable

subrogation and cannot use its debt to indirectly profit from its surety's encumbered property.

### d.    Acquiring the debt by assignment cannot shift the assignee's proportional liability to another.

Acquiring the underlying debt by assignment does not change these legal tenets. A principal debtor who shares liability—whether that liability is shared horizontally with another principal debtor, vertically with a surety, or both—cannot avoid its own proportional liability by acquiring the debt via assignment and seeking the full amount of the debt from its co-debtors, sureties, or co-sureties. Indeed, guarantors[25] have attempted just that—buying the underlying debt to avoid proportional liability and seeking to recover the entire amount from co-guarantors. Our sister courts have rejected such attempts.

---

[25]Guarantors, like sureties, bear secondary liability for the debt of another, and the Texas Civil Practice and Remedies Code lists "a guarantor" as a type of "surety." Tex. Civ. Prac. & Rem. Code Ann. § 43.001. Although guarantors and sureties are distinct, the labels are often used interchangeably. *Byrd*, 154 S.W.3d at 167 n.1 (Gray, J., dissenting) (noting that "[t]he majority opinion uses 'guarantor' and 'surety' interchangeably" and that "[t]hese days, there is not much distinction between the two terms"); *Page v. White Sewing Mach. Co.*, 34 S.W. 988, 990 (Tex. App.—Dallas 1895, no writ) (discussing distinction between sureties and guarantors but noting that "[t]he difference between a contract of guaranty and one of suretyship is not always clearly marked or well defined"); 68 Tex. Jur. 3d *Suretyship and Guaranty* § 3 (2022) (distinguishing guaranty from suretyship but noting that the two are indistinguishable in some situations and acknowledging that the two phrases are often used interchangeably); 68 Tex. Jur. 3d *Suretyship and Guaranty* § 4 (2022) (explaining that "[t]he liability of the surety [to the creditor] is direct[ while] that of the guarantor is dependent on the ability of the principal to perform").

24

In *Byrd v. Estate of Nelms*, a group of six joint venturers signed an agreement guaranteeing a debt of the joint venture, and several years later, one of the guarantors—Nelms[26]—purchased the remainder of the underlying debt and sought payment from his co-guarantors.[27] 154 S.W.3d at 152–54. On appeal, the Waco Court of Appeals found no on-point Texas case law addressing whether a guarantor who acquires the underlying debt by assignment can recover from his co-guarantors for more than their proportional shares. *Id.* at 153, 163–64.

Addressing the matter as an issue of first impression, the court reviewed the principles of contribution discussed above—"decided long ago in Texas legal history"—along with comparable case law, the laws in other jurisdictions, and the relevant provisions of the Restatement. *Id.* at 163–64. The court concluded that "[t]he assignment of [the] underlying note and guaranty agreement to a guarantor does not change the status of the guarantor in relation to his co-guarantors." *Id.* at 164. "[A]s a matter of law, the relationship between guarantors restricts recovery to their contributive share." *Id.* It explained the policy rationale behind this holding:

> Common sense dictates this result. All . . . sureties agree to be liable for
> full payment of the note if the principal debtor defaults and are further

---

[26]Nelms acted together with another co-guarantor—Nazro—but after Nelms and Nazro acquired the debt and sued their co-guarantors, Nazro was dismissed from the case for want of jurisdiction, and Nelms proceeded on his own. *Byrd*, 154 S.W.3d at 154.

[27]Nelms pointed to language in the guaranty agreement that held the co-guarantors jointly and severally liable for the underlying debt. *Id.* at 162–63.

liable for contribution to the co-surety who actually pays the creditor. Thus, each surety's ultimate liability may be fixed at his virile share of the note. If one of several sureties, as here, could purchase the note (or otherwise contractually subrogate to the creditor's rights) and then collect the full amount of the note from a co-surety, the purchasing surety would thereby escape liability for his virile portion of the debt. If [the purchasing surety] were able to succeed on their theory, then upon the debtor's default, every surety would race to the bank to purchase the note. The [law] does not contemplate that a surety's liability should be premised upon the fortuity of being the first to purchase the debtor's note.

*Id.* at 164–65 (quoting *Boyter v. Shreveport Bank & Tr.*, 65 B.R. 944, 948 (W.D. La. 1986) (mem. op.)).

The Texarkana Court of Appeals agreed with *Byrd* in *Lavender v. Bunch.* 216 S.W.3d 548 (Tex. App.—Texarkana 2007, no pet.). There, Melvin Bunch, Jr. was one of four guarantors on a promissory note, and he purchased the note by assignment. *Id.* at 550–51. He then released himself of liability and sought full payment of the underlying debt from the three remaining guarantors. *Id.* The trial court granted summary judgment in Bunch's favor, but the Texarkana Court of Appeals reversed. *Id.* at 551, 554.

The court held that Bunch could not "unilaterally exculpate himself of any proportional liability he may hold as one of the four guarantors of the note" by purchasing the debt and releasing himself from liability. *Id.* at 553. Quoting the "[c]ommon sense" policy rationale in *Byrd*, the *Lavender* court held that "[w]hen Bunch acquired the promissory note from [the original creditor], he did not trade the hat of guarantor of the note for that of holder of the obligation; he wore both hats. As

26

between the co[-]guarantors, he still maintained some liability to his co[-]guarantors for the satisfaction of the debt." *Id.* at 553–54. Even though Bunch had obtained the debt by assignment, because he was one of four guarantors, he could "recover judgment for only three-fourths of the jointly-owed amount," and no more. *Id.* at 554.

We agree with the reasoning in *Byrd* and *Lavender*[28] and find it consistent with the long-standing tenets of subrogation discussed above.[29] *See, e.g., Fox*, 119 Tex. at 517, 35 S.W.2d at 681 (holding that "where the surety pays the debt of the principal, he has his election to either . . . bring an action on . . . the obligation implied by law . . . for

---

[28]*Byrd* and *Lavender* are also supported by the Dallas Court of Appeals's unpublished dicta in *Wiman v. Tomaszewicz.* No. 05-95-01570-CV, 1997 WL 459084, at *3 (Tex. App.—Dallas Aug. 13, 1997, pet. denied) (not designated for publication) (commenting that "a guarantor does not necessarily escape responsibility for his share of the obligation under a promissory note by purchasing the note and guaranty agreement from the creditor" and that a co-guarantor "may be entitled to credit or a set-off for [the assignee's] proportional share of the debt" but noting that the issue was not before the court). And these cases are arguably in accord with our own opinion in *Holloman v. Oxford.* 168 S.W. 437 (Tex. App.—Fort Worth 1914, no writ). Although *Holloman* did not address the issue before us today, in that case we noted that, after a co-debtor paid off a shared debt, it was "not very material" whether she sued her co-debtors for contribution or as an assignee "affecting . . . only that part of the judgment which was for attorney's fees and interest at an unauthorized rate" because the paying debtor's right "to be subrogated to the rights of [the creditor] to enforce the payment of that part of the joint indebtedness assumed by [her co-debtor] actually paid [by the paying debtor] cannot be questioned." *Id.* at 438–39.

[29]This rule is also consistent with a related principle: "Generally speaking, a party cannot escape its obligations under a contract merely by assigning the contract to a third party" and "remains liable unless expressly or impliedly released by the other party to the contract." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346–47 (Tex. 2006).

27

reimbursement by the principal; or he can prosecute an action on the very debt itself, and in either event he stands in the shoes of the original creditor"). Although courts have grappled with the finer points of the distinction between subrogation and assignment—going back and forth as to whether a surety's or co-debtor's payment to the creditor extinguishes the underlying note such that the co-debtor cannot sue on the note itself—such finer points are not at issue here. *See Fort Worth Lloyds v. Haygood*, 151 Tex. 149, 161 n.1, 246 S.W.2d 865, 872 n.1 (1952) (Wilson, J., dissenting) (discussing English roots of subrogation and Lord Eldon's doctrine and describing the historical distinction between subrogation and assignment as "one of the most thorny problems in Texas jurisprudence"); *see also Fox*, 119 Tex. at 514–18, 35 S.W.2d at 679–81 (discussing surety rights and whether surety's payment of a debt extinguishes the debt such that surety cannot sue on the note itself); *Faires v. Cockrill*, 88 Tex. 428, 437–38, 31 S.W. 190, 194–95 (1895) (applying statute of limitations based on contribution rather than that based on the written contract for the debt in case involving co-debtors), *disapproved of on other grounds by Fox*, 119 Tex. at 514–16, 35 S.W.2d at 680; *Gaines*, 119 S.W.2d at 430 (distinguishing *Fox* and holding that co-debtor's payment extinguished debt such that "he could no longer sue his co[-]principal on the note; but his right of action was one on the [equitably] implied promise of plaintiff to reimburse him"); *Holloman*, 168 S.W. at 438–39 (reforming judgment to remove contractual interest and attorney's fees and holding that co-debtor who paid note and acquired it by assignment was recovering for contribution rather than on the note itself). The issue here is

28

whether a debtor can, if he acquires his own debt by assignment, exculpate himself from the debt and force his co-debtors or sureties to pay for his debt. To that question, we agree with our sister courts that case law and "[c]ommon sense" dictate a resounding "no." *Lavender*, 216 S.W.3d at 553–54 (quoting *Byrd*); *Byrd*, 154 S.W.3d at 165 (quoting *Boyter*, 65 B.R. at 948).

The assignment to a principal debtor of its own debt and corresponding lien does not change the proportional liability of that debtor in relation to its co-debtors or sureties.

### e. Had CL been solely, individually responsible for the Orr debt, it could not have changed that via an assignment.

Putting these pieces together, if CL had been solely, principally liable for the Orr debt, then Strategic would have been a surety for CL's debt, and CL's acquisition of the Orr debt would not have changed its status in relation to its surety.

## C. The foreclosure judgment necessarily established that CL was not the sole, principal debtor.

The foreclosure judgment held that CL was legally entitled to enforce the Orr lien and to recover the full amount of the Orr debt from Plaintiffs:

> It is ORDERED, ADJUDGED, and DECREED that the Subject Lien is a valid and perfected mineral contractor lien . . . in the amount of $413,030.00 (the "Subject Lien Indebtedness") which attaches to and encumbers EagleRidge Midstream's interests in the Encumbered Property; and it is further,
>
> ORDERED, ADJUDGED, and DECREED that the Sheriff of Montague County, Texas is directed to levy on the Encumbered Property and sell the Encumbered Property at a foreclosure sale to the highest

bidder, *with the proceeds thereof to be paid to CL III and applied against the [$413,030.00] Subject Lien Indebtedness*; and it is further

ORDERED, ADJUDGED, and DECREED that *CL III may credit bid any or all of the [$413,030.00] Subject Lien Indebtedness* to purchase the Encumbered Property at any such foreclosure sale[.]    [Emphasis altered.]

If CL had assumed sole principal liability for the Orr debt and released U.S. Energy from liability—as Plaintiffs claim happened—then Plaintiffs would have had no legal obligation to pay CL for any portion of the Orr debt.

"[W]ithout a debt there can be no lien.'" *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *7 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op.) (quoting *Shipley v. Biscamp*, 580 S.W.2d 52, 54 (Tex. App.—Houston [14th Dist.] 1979, no writ)); *cf. Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 144 (Tex. App.—Amarillo 1995, writ denied) (recognizing that "if limitations prevent collection of the debt, then the lien becomes unenforceable."). "[A] specific debt (an obligation to pay money) is necessary to support a lien; the lien is affixed to land as security for some obligation to pay money." *Calvert v. Hull*, 475 S.W.2d 907, 911 (Tex. 1972); *see Daughters of Charity Health Servs. of Waco v. Linnstaedter*, 226 S.W.3d 409, 411 (Tex. 2007) ("A lien is part and parcel of the underlying claim, the former existing only because of the latter."). A lien is an incident of and inseparable from the underlying debt. *Fritts*, 2017 WL 3821889, at *7; *see Univ. Sav. & Loan Ass'n v. Sec. Lumber Co.*, 423 S.W.2d 287, 292 (Tex. 1967).

30

Because a principal debtor's acquisition of its own debt by assignment does not change its relationship with its surety, then CL could not have collected its own debt from its surety even if it attempted to do so as the creditor's assignee. And without a debt to collect, it could not have enforced the lien securing that debt.

CL's sole, principal liability for the Orr debt would thus have provided a complete defense to CL's lawsuit to collect the Orr debt through foreclosure of Strategic's Property interest. And the same is true of CL's alleged release of U.S. Energy from any principal liability. If the release resulted in CL's sole, individual liability for the debt, then CL could not have foreclosed. *See Fritts*, 2017 WL 3821889, at *7 (holding that "[b]ecause the Settlement Agreement released the debt underlying the Judgment Lien, the Judgment Lien [wa]s unenforceable"); *cf. Corcanges v. Childress*, 264 S.W. 175, 176 (Tex. App.—San Antonio 1924, no writ) (op. on reh'g) (reversing on collateral attack grounds because debtor obtained injunction to prevent sale of land based on alleged release of notes that would have "constituted a complete defense" if debtor had raised release as defense in previous suit).

By ordering foreclosure, the foreclosure court necessarily found that there were no such bars to enforcement of the Orr lien, meaning that—at least as between Plaintiffs and CL—Plaintiffs were obligated to pay for the full amount of the Orr debt, and CL was not the sole, principal debtor.[30] *Cf. Landa v. Isern*, 141 Tex. 455, 460–64,

---

[30]Furthermore, if CL and Plaintiffs had shared liability for the Orr debt as co-debtors or co-sureties—a possibility Plaintiffs entertained at one point in this

31

174 S.W.2d 310, 312–14 (Tex. [Comm'n App.] 1943) (holding that second suit was barred by estoppel because "[t]he [previous foreclosure court's] adjudication that a bona fide lien on the land grew out of its conveyance [by the vendor] is fundamentally antagonistic to any theory [in the current lawsuit] that the [vendor's] lien was spurious because it arose out of a transaction reeking with fraud").

## D. Plaintiffs' breach of contract suit is an impermissible collateral attack on the foreclosure judgment.

Plaintiffs' contract claim—which, again, turns on a finding that CL was "solely," principally liable for the Orr debt—seeks to undermine the foreclosure judgment. Either CL was solely, principally liable for the Orr debt, or CL had the legal authority to foreclose on the Orr lien and collect the Orr debt from Plaintiffs. They cannot both be true. Plaintiffs' case is thus an impermissible collateral attack.

"It is an elementary principle"—and has been for more than a century—"that the judgments of a Court of competent jurisdiction are revisable only in an appellate Court, and cannot be impeached collaterally." *Lee v. Kingsbury*, 13 Tex. 68, 70–71 (1854). "A collateral attack on a judgment is an effort to avoid its binding force in a proceeding, instituted not for the purpose of correcting, modifying, or vacating it, but in order to obtain specific relief against which the judgment stands as a bar." *Cadle Co. v. Lobingier*, 50 S.W.3d 662, 672 (Tex. App.—Fort Worth 2001, pet. denied) (en banc) (quoting

---

litigation—CL could not have recovered the full amount of the Orr debt from the foreclosure proceeds; it could have recovered only its co-debtors' or co-sureties' proportional shares of liability. *Cf. Holloman*, 168 S.W. at 438–39.

*Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 549 (Tex. App.—Houston [1st Dist.] 1994, no writ), and distinguishing direct appeals from collateral attacks); *see Cantu v. Butron*, 921 S.W.2d 344, 348 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied).  A judgment "imports absolute verity to every proposition essential to its existence." *Landa*, 141 Tex. at 463, 174 S.W.2d at 314.  Unless the challenged judgment is void[31] (which Plaintiffs do not allege), "[c]ollateral attacks on final judgments are generally disallowed because it is the policy of the law to give finality to the judgments of the courts." *Browning v. Prostok*, 165 S.W.3d 336, 345 (Tex. 2005).

Procedurally, a collateral attack can be thwarted in multiple ways:

- as a matter of evidentiary sufficiency, *Victory v. State*, 138 Tex. 285, 288, 158 S.W.2d 760, 763 (Tex. [Comm'n Op.] 1942) (affirming trial court's conclusion that prior judgment was conclusive as to validity of lien);

- waiver, *Baze v. Marine Off. of Am. Corp.*, 828 S.W.2d 152, 155–56 (Tex. App.—Corpus Christi–Edinburg 1992, no writ) (op. on reh'g) (holding that collateral attack had been waived by failure to object and appeal the attacked judgment);

- the "law of the case," *Boudreaux Civic Ass'n*, 882 S.W.2d at 548–50 (rejecting collateral attack based on "law of the case" doctrine);

---

[31]*Cf. Robertson v. Ranger Ins.*, 689 S.W.2d 209, 210 (Tex. 1985); *Segrest v. Segrest*, 649 S.W.2d 610, 611 (Tex. 1983)*; Austin Indep. Sch. Dist. v. Sierra Club*, 495 S.W.2d 878, 881–82 (Tex. 1973).

- incompetent evidence, *Lee*, 13 Tex. at 70–72 (affirming demurrer to answer and rejection of defendant's evidence that attempted to impeach prior foreclosure judgment by proving that property was homestead); or

- perhaps most often, collateral estoppel or res judicata,[32] *see Landa*, 141 Tex. at 460–63, 174 S.W.2d at 312–14 (holding foreclosure judgment on vendor's lien estopped debtors from bringing subsequent action for fraud when fraud allegedly occurred in sale of land that gave rise to vendor's lien); *Windmill Dinner Theatre of Dall., Inc. v. C. W. Hagler*, 582 S.W.2d 585, 586–88 (Tex. App.—Dallas 1979, writ dism'd) (applying doctrine of collateral estoppel and holding that second lawsuit was barred by first because "the judgment in the prior case was an adjudication that [lienholder] was not entitled to recovery of any part of the . . . excess proceeds [from foreclosure] on any theory, and by implication on the removable fixture theory" that lienholder advanced in his second lawsuit).

---

[32]CL did not plead res judicata or collateral estoppel. But, as noted above, these are not the only means of challenging a collateral attack, and the prohibition on collateral attacks "do[es] not constitute an affirmative defense within the meaning of Rule 94, Texas Rules of Civil Procedure." *Austin Indep. Sch. Dist.*, 495 S.W.2d at 882 (holding collateral attack argument had not been waived); *see Victory*, 138 Tex. at 288, 158 S.W.2d at 763 ("[I]t is the established law of this state that . . . a former judgment may be held to be conclusive in a subsequent action when the record shows a judgment rendered in a cause involving the same subject matter between the same or practically the same parties, even though no plea of res adjudicata was interposed in the subsequent suit."); 48 Tex. Jur. 3d *Judgments* § 456 (2022) (similar).

Or a collateral attack can be rejected on that basis alone.[33]

In *Austin Independent School District v. Sierra Club*, for example, the Texas Supreme Court rejected the Sierra Club's lawsuit as an impermissible collateral attack. 495 S.W.2d at 880–82. There, the City of Austin and the Austin Independent School District entered into a contract related to Zilker Park. *Id.* at 879. The Zilker Park land had been indirectly donated to the City, but it was subject to the requirement that it be used for park purposes. *Id.* The City then entered into a contract with the District, agreeing that the District could exercise eminent domain authority to acquire portions of the park from the City. *Id.* at 879–80. The District, in turn, agreed to comply with certain conditions on its use of the property, such as maintaining recreational facilities and granting the City an easement for a public trail. *Id.*

The District proceeded to condemn the land, but after the eminent domain proceeding ended and the judgment became final, the Sierra Club sued the City and the District in a different court. *Id.* at 880. The Sierra Club claimed that the District had not possessed the power to condemn land and that the contract between the District and the City was void because it violated various Texas statutes and provisions of the City's charter. *Id.* at 880–81. The Texas Supreme Court held that this was an

---

[33]As noted above, CL alleges that there was legally insufficient evidence that it breached the Montague Agreement because it "was not individually obligated to pay 100% of the Orr Lien." It also argues that Plaintiffs waived their right to challenge the foreclosure judgment, emphasizing Plaintiffs' voluntary payment of the foreclosure judgment and dismissal of their appeal.

impermissible collateral attack on the eminent domain judgment. *Id.* at 881. The eminent domain court had vested title in the District, and the Sierra Club's lawsuit sought to indirectly "depriv[e] the District of rights it apparently [wa]s entitled to enjoy under the judgment of the [eminent domain court]." *Id.* The Texas Supreme Court thus addressed the collateral attack argument as an issue all its own, and based on that issue, the court reversed the intermediate court's decision and affirmed the trial court's judgment for the City and the District. *Id.* at 881–82.

The high court reiterated the prohibition on collateral attacks in *Browning v. Prostok.* 165 S.W.3d at 346–51. There, a corporation filed for bankruptcy, and more than two years after the debtor's reorganization plan had been confirmed by the bankruptcy court, a class of bondholders sued and alleged that the officers and directors had committed fraud, had engaged in a civil conspiracy, and had breached their fiduciary duties by intentionally undervaluing the corporation's assets.[34] *Id.* at 340–42, 346. The bondholders claimed that, as a result of the officers' and directors' tortious conduct, the bondholders had received less than they should have received in the bankruptcy proceedings. *Id.* at 346. The Texas Supreme Court rejected these claims as collateral attacks, explaining that "while [the bondholders'] action contemplate[d] relief other

---

[34]The bondholders sued not only the officers and directors but also the relevant financial advisor and the senior bondholders. *Browning*, 165 S.W.3d at 341–42. The debtor's new corporation later intervened in the action; it claimed that the bondholders lacked standing and that it owned the bondholders' claims. *Id.* at 342.

than revoking the [bankruptcy court's] confirmation order, it necessarily challenge[d] the integrity of the order and result[ed] in a review, perhaps a recalculation, of the bankruptcy determinations of the assets to which some claimants [we]re entitled." *Id.* at 346–47. In short, "[t]he success of [the bondholders'] state court suit necessarily turn[ed] upon what the judgment of the bankruptcy court should have been," and it was thus an impermissible collateral attack. *Id.* The Texas Supreme Court reversed the judgment as to the officers and directors, and it rendered judgment that the bondholders take nothing.[35] *Id.* at 351.

Plaintiffs' current breach of contract suit similarly "turns upon what the judgment of the [foreclosure] court should have been." *See id.* at 347. In the trial below, Plaintiffs sought and obtained findings that CL bore sole, principal liability for the Orr debt and that CL's foreclosure action enforced CL's own "sole," "individual[]" liability against a "non-encumbered" co-owner. Such findings directly conflict with the foreclosure judgment and undermine its integrity. *Cf. Fiallos v. Pagan-Lewis Motors, Inc.*, 147 S.W.3d 578, 586 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied) (holding that negligent entrustment suit which determined truck's owner on specific date was

---

[35]In *Browning*, the trial court had initially granted the defendants summary judgment. *Id.* at 343. The intermediate court of appeals reversed as to the officers and directors and affirmed as to another defendant. *Id.* at 343, 351 n.13. Based on its conclusion that the suit was an impermissible collateral attack, the Texas Supreme Court reversed and rendered as to the officers and directors, and it affirmed the take-nothing portion of the intermediate court's judgment as to the other defendant. *Id.* at 351 & n.13.

not a collateral attack on previous collection suit to recover truck's purchase price because "on or about" language in previous judgment was vague, so even if the defendant "owned or controlled the truck on September 12, it still could have sold it 'on or about' September 10" as the previous court found). If CL had been the sole principal debtor and if Strategic's Property interest had been merely a surety for CL's sole debt, then the foreclosure court could not have ordered foreclosure of Strategic's interest to satisfy CL's debt. Nor could the foreclosure court have awarded CL the full amount of the Orr debt from the foreclosure proceeds. Plaintiffs' breach of contract action thus seeks a "review, perhaps a recalculation, of the [foreclosure court's] determinations" of CL's liability for the Orr debt, and it seeks relief to which the foreclosure judgment stands as a bar—namely, the return of the money that the foreclosure court required the Plaintiffs to pay to satisfy the Orr debt. *See Browning*, 165 S.W.3d at 346–47.

To the extent that Plaintiffs believe the foreclosure judgment to be erroneous, they needed to battle that out in the foreclosure suit.[36] *See Lee*, 13 Tex. at 71 ("It is not

---

[36]From the record, it appears that Plaintiffs raised at least some of their current arguments in the foreclosure court. In the foreclosure case, CL filed a motion for partial summary judgment, in which it argued that it "[wa]s the proper party to enforce the Orr Lien." U.S. Energy countered that CL "d[id] not have a right to recover money from U.S. Energy" and that "genuine issues of material fact exist[ed] . . . [as to] whether U.S. Energy owe[d] [CL] money or whether [CL] owe[d] the money to U.S. Energy." [Capitalization altered.] The foreclosure court granted CL's motion for partial summary judgment.

necessary to the conclusiveness of the former judgment that issue should have been taken upon the precise point which it is proposed to controvert in the collateral action. It is sufficient if that point was essential to the former judgment."). That suit is now over, Plaintiffs voluntarily dismissed their appeal, and the foreclosure judgment became final. *See U.S. Energy Dev. Corp.*, 2020 WL 479583, at *1. Plaintiffs cannot "avoid the binding force of [the foreclosure] judgment" and "attempt[] to bypass the appellate process in challenging the integrity of [the] judgment" by suing for breach of contract to "obtain specific relief against which the [foreclosure] judgment stands as a bar." *Browning*, 165 S.W.3d at 346; *Fiallos*, 147 S.W.3d at 586. We sustain CL's second and fifth arguments and agree that Plaintiffs' suit constituted an impermissible collateral attack.[37]

### III. Conclusion

The foreclosure judgment established that CL was legally entitled to enforce the Orr lien against Strategic's Property interest and to collect the full amount of the Orr debt from Plaintiffs. For this to be so, the foreclosure court must necessarily have established that—at least as between CL and Plaintiffs—CL was not the primary, sole debtor responsible for the Orr debt. Because Plaintiffs' breach of contract action is premised on CL's "sole," "individual[]" liability for the Orr debt, the breach of contract

---

[37]Because CL's second and fifth arguments are dispositive of the appeal, we need not address its remaining arguments. *See* Tex. R. App. P. 47.1.

action is an attempt to collaterally attack the foreclosure judgment and avoid its binding, legal effect. We agree with CL that this is an impermissible collateral attack. Accordingly, we reverse the trial court's judgment and render judgment that Appellees take nothing. *See* Tex. R. App. P. 43.2(c), 43.3.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: October 27, 2022